**SUPERIOR OIL COMPANY, Appellee,**

v.

**Huey FULMER; James Branch; Roy Nichols and any other persons claiming an interest in property described further in these pleadings, Appellants.**

**SUPERIOR OIL COMPANY, Appellant,**

v.

**Huey FULMER; James Branch; Roy Nichols and any other persons claiming an interest in property described further in these pleadings, Appellees.**

Nos. 84–2511, 84–2561.

United States Court of Appeals, Eighth Circuit.

Submitted June 10, 1985.

Decided March 5, 1986.

Rehearing Denied April 7, 1986.

Nicholas H. Patton, Texarkana, Ark., for appellant.

Winford L. Dunn, Jr., Texarkana, Ark., for appellee.

Before HEANEY and BOWMAN, Circuit Judges, and WANGELIN,* Senior District Judge.

WANGELIN, Senior District Judge.

This is an appeal from a jury-tried case. The jury found for plaintiff, Superior Oil Company, and against the defendants, Huey Fulmer, James Branch, and Roy Nichols. It returned a verdict on the claim for wrongful conversion in the amount of $145,125.00, on the claim under the Racketeer Influenced and Corrupt Organizations Act (RICO) in the amount of $25,000.00, and against defendant Fulmer alone on a compressor rental claim in the amount of $26,397.70. The court trebled the RICO award.

## I. BACKGROUND.

Huey Fulmer was an employee for Austral Oil Company (Austral). Austral had developed several oil and gas wells in South Lafayette County, Arkansas, and Fulmer was responsible for the mechanical upkeep and the production at the wells. Fulmer also leased a compressor to Austral to increase pressure in the pipeline and thereby aid the flow of Liquid Petroleum Gas (LPG) to an International Paper Company plant from a well denominated as International Paper Company No. 2 (I.P. No. 2).

I.P. No. 2 consists of an oil/gas well from which a pipeline runs to a separator plant. The oil is then transferred through a pipeline to two storage tanks. The LPG product continues down another pipeline, through a compressor, eventually joining with a pipeline that runs to the International plant. Just prior to the junction of the Superior and International pipelines is a metering devide and a six-inch flange. This was the physical arrangement of I.P. No. 2.

When appellee Superior Oil Company (Superior Oil) purchased this operation from Austral, it retained Fulmer as a pumper and also as lessor of the compressor unit. In 1981, Fulmer entered into a partnership with James Branch and Roy Nichols whereby they would install a cryogenic plant on the pipeline to remove the heavier hydrocarbons from the natural gas supply. To that end, they procured a letter of permission from the manager of the International Paper Company (International) mill to put a dryer on the pipeline. Testimony at trial indicated that the letter was addressed to Fulmer as the representative and employee of the appellee and that appellant Fulmer never indicated that the letter was intended for his personal use nor was it meant to convey ownership of LPG products. The mill manager also stated that he understood the purpose of Fulmer's request was to remove water from the gas purchased from I.P. Well No. 2, and that he would have no authority to authorize the installation of a cryogenic unit.

After Branch and Nichols installed the cryogenic plant, Fulmer removed the metering unit from its position near the juncture of the Superior Oil and International pipelines. This unit measured the quantity of gas moving through the pipeline and formed the basis for billing International. Fulmer installed the meter at a point on the pipeline prior to, or "upstream" from, the cryogenic plant. The original position of the meter had been "downstream" from the plant.

The cryogenic unit had the effect of reducing the burning capacity of the LPG product. The contract between Superior Oil and International provided that the LPG product purchased by International have a minimum 1,000 BTU capacity. It also provided that a premium would be paid for BTU capacity above 1,000. Testimony at trial indicated that the cryogenic plant reduced the BTU capacity from 1,170–1,200 BTU to approximately 1,050 BTU.

Among Fulmer's other duties as pumper of the Superior Oil station was to make daily reports regarding the pressure at the wellhead and in the pipeline.

Fulmer regularly reported that there was thirty pounds of pressure at the well-

* THE HONORABLE H. KENNETH WANGELIN, Senior United States District Judge for the Eastern and Western Districts of Missouri, sitting by designation.

head. At this pressure level, a well is barely producing and must have a compressor on the pipeline to operate efficiently. After Fulmer's termination, Superior Oil employees found that the actual wellhead pressure was between 300 to 380 pounds. At these pressure levels, a compressor unit is unnecessary. Testimony at trial indicated, however, that the appellant utilized the compressor to increase the pressure in the pipeline to 400 pounds in order to increase the efficiency of the cryogenic unit.

Reported oil production during the time that Fulmer operated the station also differed radically from subsequent events. Under Fulmer's operation, the well produced approximately seventeen barrels of oil for every million cubic feet of gas. When Superior undertook operation of the plant, oil production increased to approximately thirty-five barrels per million cubic feet of gas. This production output has remained constant since that time.

In this regard, relevant testimony indicated that all authorized sales of oil were made to P & O Fulco. On several occasions, however, Delton Hanson, an employee of one Dewey Williams, testified that he had gone to I.P. No. 2 and picked up truckloads of oil. Fulmer was present on these occasions, and demonstrated to Hanson how the oil could be obtained without breaking the seals.

Superior was notified by an anonymous letter that Fulmer was stealing LPG product. It notified the Federal Bureau of Investigation (FBI) which investigated the allegations. Fulmer was later arrested and the cryogenic plant was seized by the FBI and placed in Superior Oil's possession. Fulmer's indictment was dismissed and Superior Oil was ordered to return the cryogenic plant. Thereafter, Superior Oil filed a cause of action for a receiver to be appointed in the Chancery Court of Lafayette County, Arkansas. This action was removed to the United States District Court where Superior prevailed.

## II. DISCUSSION.

Under Arkansas law, which controls this diversity action, a reviewing court must examine the evidence in the light most favorable to the appellee and must sustain the jury verdict if it is supported by substantial evidence. *DeWitt v. Brown*, 669 F.2d 516 (8th Cir.1982); *Garoogian v. Medlock*, 592 F.2d 997, 999–1000 (8th Cir.1979).

■ The appellants cite as their first point of error that the Court erred in failing to direct a verdict in favor of the appellants on the issue of conversion of LPG products. Essentially, the appellants argue that no conversion of the LPG products occurred because the meter which determined the amount of product sold to the International plant was moved upstream of the cryogenic unit. Thus, the appellants conclude that the appellee suffered no loss through the taking of the LPG product.

We disagree. The contract between Superior Oil and the International specified that the point of delivery of the LPG product was a six-inch flange downstream of the cryogenic unit. Moving the meter unit did not change the contractually mandated point of sale. Thus, whether the meter was upstream or downstream to the cryogenic unit is irrelevant; the LPG product belonged to appellee Superior Oil at the time of its conversion.

Nor can it be said that Superior Oil suffered no damages. The evidence adduced at trial, even under appellant's theory of the case, indicated that the International was billed $145,125.00 of LPG product that it did not receive. It would appear then that the unauthorized taking of the LPG product by appellant Fulmer, a then-employee of Superior Oil, resulted in a breach of contract with International. This Court is not prepared to rule that the taking of goods, by a seller's employee, entrusted to deliver those goods, does not result in some damages to the seller.

The appellants next allege that the trial court erred in failing to direct a verdict in their favor on the RICO count. We agree. In our view, Superior Oil failed to prove that Fulmer, Branch and Nichols engaged in a "pattern of racketeering activity" as that term is construed in the United States

Supreme Court's recent decision in *Sedima, S.P.R.L. v. Imrex Co.*, — U.S. —, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). In *Sedima*, the Court held that "[a] violation of § 1962(c), the section on which [Superior Oil] relies, requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." 87 L.Ed.2d at 358–59 (footnote omitted).[1] The definition of a "pattern of racketeering activity" set forth in section 1961(5) states that a pattern "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years * * * after the commission of a prior act of racketeering activity." "Racketeering activity" is defined in section 1961(1) to include a wide range of criminal acts, including mail and wire fraud.

Prior to the Supreme Court's decision in *Sedima*, several courts had suggested that a "pattern of racketeering activity" requires "related"[2] predicate acts which have "continuity" in the sense of some prolonged course of conduct, not merely an isolated event.[3]

The majority of pre-*Sedima* decisions, however, concluded that a "pattern" of racketeering activity could be proved simply by showing the commission of two acts of "racketeering activity" within the last ten years, *see, e.g., Alexander Grant v. Tiffany*, 742 F.2d 408, 410 (8th Cir.1984), *vacated*, — U.S. —, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985), *on remand*, 770 F.2d

---

1. Sections 1962(a) and (b) also share in common the "pattern of racketeering activity" requirements.

2. *See, e.g., United States v. Stofsky*, 409 F.Supp. 609, 612–14 (S.D.N.Y.1973), *aff'd*, 527 F.2d 237 (1975), *cert. denied*, 429 U.S. 819, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976) ("The racketeering acts must have been connected to each other by some common scheme, plan or motive so as to constitute a pattern and not simply a series of disconnected acts.").

3. *See, e.g., United States v. Computer Sciences Corp.*, 689 F.2d 1181, 1189–90 (4th Cir.1982) (*dicta* stating that, "[w]e express doubt that Congress ever contemplated the extension of the RICO statute to include a situation where one of the predicate offenses, separated in character and by a long time period, could combine with a set of closely related wire fraud and mail fraud claims essentially representing subdivisions of a single ongoing illegal act to meet the predicate requirements of so serious a statute."); *Exetor Towers Associates v. Bowditch*, 604 F.Supp. 1547, 1554–55 (D.Mass.1985) ("I conclude that the connotations of a 'pattern of racketeering activity,' as that phrase is used in the RICO statute, are not satisfied by proof that, in effectuating the purchase of a single mortgage, the defendants committed two or more predicate acts of mail fraud. To construe the statute as applying in these circumstances would be to give it a sweep so broad as to be inconsistent with manifested congressional objectives. Most substantial business transactions involve two or more uses of the mail during negotiations. To hold that two such uses of the mail, in circumstances otherwise satisfying the prerequisites of proof of an offense under the mail fraud statute, are sufficient to constitute a 'pattern of racketeering activity' would be to sweep into federal courts, under RICO, the great majority of actions for fraud in commercial transactions. I conclude that the Supreme Court will not read the RICO statute this broadly, whatever may be the precise terms of the limiting formulation it fashions."); *Teleprompter of Erie, Inc. v. Erie*, 537 F.Supp. 6, 13 (W.D.Pa.1981) (Court holds that the alleged receipt by a councilman of multiple bribes at a single political fundraiser was not a *"series* of unlawful acts sufficient to establish 'a pattern of racketeering activity' within the meaning of RICO."); *United States v. Field*, 432 F.Supp. 55, 59 (S.D.N.Y.1977) ("The language of the Act, which makes a pattern of conduct the essence of the crime, 'clearly contemplates a prolonged course of conduct.' "); *United States v. Moeller*, 402 F.Supp. 49, 57–58 (D.Conn.1975) (*dicta* stating that, "I would have thought the common sense interpretation of the word 'pattern' implies acts occurring in *different criminal episodes*, episodes that are at least somewhat separated in time and place yet still sufficiently related by purpose to demonstrate a continuity of activity. I would further have thought that the normal canon of narrowly construing penal statutes points toward such an interpretation. Finally, I would have thought that the legislative history made such an interpretation clear."); *United States v. White*, 386 F.Supp. 882, 883 (E.D.Wis.1974) (Court holds that the term "pattern" was not unconstitutionally vague because "[i]n common usage, the term 'pattern' is applied to a combination of qualities or acts forming a consistent or characteristic arrangement."); *Stofsky*, 409 F.Supp. at 614 ("In spite of the quantitative nature of the section 1961 definition of 'pattern,' the major concern of Congress * * * was the special danger * * * of a continuity of racketeering activity.").

717 (8th Cir.1985);[4] *United States v. Aleman,* 609 F.2d 298 (7th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Parness,* 503 F.2d 430 (2d Cir.1974), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975), even if the two acts occurred on the same day, in the same place, and formed a part of the same criminal episode. *Parness,* 503 F.2d at 441–42.

In *Sedima,* the Supreme Court suggested that it disagreed with this broad construction of "pattern."

> The "extraordinary" uses to which civil RICO has been put appear to be primarily the result of the breadth of the predicate offenses, in particular the inclusion of wire, mail, and securities fraud, and the failure of Congress and the courts to develop a meaningful concept of "pattern." —— U.S. at ——, 105 S.Ct. at 3287, 87 L.Ed.2d at 361.

Footnote 14 in *Sedima* went on to state:

> As many commentators have pointed out the definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern *"requires* at least two acts of racketeering activity," § 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a

pattern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added [in *Sedima* ]). Similarly, the sponsor of the Senate bill, after quoting this portion of the Report, pointed out to his colleagues that "[t]he term 'pattern' itself requires the showing of a relationship .... So, therefore, proof of two acts of racketeering activity, without more, does not establish a pattern...." 116 Cong.Red. 18940 (1970) (statement of Sen. McClellan). See also *id.,* at 35193 (statement of Rep. Poff) (RICO "not aimed at the isolated offender"); House Hearings, at 665. Significantly, in defining "pattern" in a later provision of the same bill, Congress was more enlightening: "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. § 3575(e). This language may be used in interpreting other sections of the Act. *Cf. Iannelli v. United States,* 420 U.S. 770, 789, 95 S.Ct. 1284, 1295, 43 L.Ed.2d 616 (1975).[5] *Id.* —— U.S. at —— n. 14, 105 S.Ct. at 3285 n. 14, 87 L.Ed.2d at 358–59 n. 14.

Justice Powell's dissent emphasizes that in examining "pattern," "the presence of the predicate acts is only the beginning: something more is required for a 'pattern' to be proved." 105 S.Ct. at 3289. He suggested his agreement with the ABA Civil RICO report:

> The ABA report suggests that to effectuate this legislative intent, "pattern" should be interpreted as requiring that (i) the racketeering acts be related to each other, (ii) they be part of some common scheme; (iii) some sort of continuity between the act or a threat of criminal activity be shown. * * * By construing

---

**4.** *But see United States v. Anderson,* 626 F.2d 1358, 1367 (8th Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981) ("use of the 'enterprise' element to provide a relationship between the two predicate crimes aids to contain the prohibitions of RICO rather than to

expand them to cover purely sporadic criminal activity").

**5.** The Court declined, however, to decide whether the defendants' acts constituted a pattern because it concluded that that question was not before the court.

"pattern" to focus on the manner in which the crime was perpetrated, courts could go a long way toward limiting the reach of the statute to its intended target—organized crime.

— U.S. ——, 105 S.Ct. at 3290, 87 L.Ed.2d at 378 (citing Report of the Ad Hoc Civil RICO Task Force of the ABA Section of Corporation, Banking and Business Law 193–208 (1985)).[6]

■ In short, proof of a "pattern of racketeering activity" "requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." *Sedima*, —— U.S. at —— n. 14, 105 S.Ct. at 3285 n. 14, 87 L.Ed.2d at 358–59 n. 14 (quoting S.Rep. No. 91–617, p. 158 (1969)).[7] Superior Oil clearly has proved the "relationship" prong. They proved several related acts of mail and wire fraud in pursuit of the underlying conversion or theft of gas from Superior Oil's interstate pipeline. *See Sedima*, —— U.S. at —— n. 14, 105 S.Ct. at 3285 n. 14, 87 L.Ed.2d at 359 n. 14.

■ Superior Oil has, however, failed to prove the "continuity" sufficient to form a "pattern of racketeering activity." The actions of Fulmer, Branch, and Nichols comprised one continuing scheme to convert gas from Superior Oil's pipeline. There was no proof that Fulmer, Branch, or Nichols had ever done these activities in the past and there was no proof that they were engaged in other criminal activities elsewhere.

Superior Oil attempted to show that Fulmer, Branch, and Nichols intended to engage in similar gas conversion schemes at other locations. Although it may be that proof of a threat of continuing racketeering activities in the future could, in combination with ongoing acts of racketeering, be sufficient to establish a "pattern of racketeering," we find insufficient proof of such a threat here. Instead, the record reveals one isolated fraudulent scheme. On the facts of this case, we agree with the court's conclusion in *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.*, 615 F.Supp. 828, 832 (D.C.Ill.1985), that "[i]t is difficult to see how the threat of continuing activity stressed in the Senate Report could be established by a single criminal episode. * * * It places a real strain on the language to speak of a single fraudulent effort, implemented by several fraudulent acts, as a "pattern of racketeering activity." [8]

---

6. More specifically, the ABA report concludes that a "pattern" requires that the predicate acts be related to a common scheme and that they involve at least two criminal episodes.

7. The *Sedima* Court also suggested that the courts look to the definition of "pattern" in 18 U.S.C. § 3575(e), in giving meaning to RICO's "pattern of racketeering activity" requirement. This definition construes pattern as a series of related acts which "are not isolated events." Although our research reveals no judicial interpretations of section 3575(e)'s pattern requirement, the legislative history behind this element indicates that it was intended to isolate the professional, long-term criminal elements in society. *See* 116 Cong.Rec. 847 (Jan. 22, 1970) (statement of Senator Hruska) (This section is aimed at "the special criminal. That is the kind who will never be rehabilitated * * * because he has participated in a life of illegal conduct."); *Organized Crime Control, Hearings on S. 30 and Related Proposals before Subcomm. No. 5 of the House Comm. on the Judiciary*, 91st Cong., 2d Sess. 130 (1970) (Statement of Senator McClellan) ("If there is a pattern of illegal conduct, in other words, if they are more or less profession-

al criminals engaged in crime, you have the beginning of a special offender situation."); *id.* at 245 (The "pattern of conduct" requirement would not be "just another bribery count or something of that nature. It would be continuous conduct like that of a major bookie operating over a long period of time.")

8. For other similar post-*Sedima* opinions, see *Allington v. Carpenter*, 619 F.Supp. 474 (C.D.Cal. 1985) (Court dismisses without prejudice a RICO claim based on allegations that the defendants falsely promised high rates of return on loans secured by worthless promissory notes or real estate trust deeds, holding that the commission of three acts of wire fraud in connection with this single and isolated fraudulent scheme comprised merely a single criminal episode rather than a "pattern of racketeering activity."); *Professional Assets Management, Inc. v. Penn Square Bank, N.A.*, 616 F.Supp. 1418 (W.D. Okla.1985) (Court dismisses RICO action against accounting firm for allegedly fraudulent preparation of a single audit on Penn Square Bank. In dismissing the claim of fraudulent preparation of the audit, the court held that the claim

We also express doubt over whether Superior Oil proved the "enterprise" element of a RICO action. In *United States v. Anderson*, 626 F.2d 1358, 1365 (8th Cir. 1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981), we held that "[t]he term 'enterprise' must signify an association that is substantially different from the acts which form the 'pattern of racketeering activity'." *See also United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981); *Bennett v. Berg*, 685 F.2d 1053, 1061–63 (8th Cir.1982), *aff'd in part and rev'd in part on other grounds*, 710 F.2d 1361 (8th Cir.1983) (en banc), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *United States v. Bledsoe*, 674 F.2d 647, 665 (8th Cir.1982); *Bennett v. United States Trust Co. of New York*, 770 F.2d 308, 315 (2d Cir.1985) (post-*Sedima* application of this test). Here, Fulmer, Branch and Nichols entered into a partnership which had the sole purpose of converting and selling the heavier hydrocarbons from Superior Oil's gas pipeline to the International Paper Company. This partnership appears to have had no purpose distinct from the conduct inherent in their conversion scheme. We need not definitively rule on this issue,

however, in light of our holding that Superior Oil failed to prove that the appellants engaged in a "pattern of racketeering activity." [9]

Accordingly, we vacate the jury's award on Superior Oil's RICO claim, and dismiss appellee's cross-appeal on the RICO issue.

■ Finally, the appellants contend that the trial court erred in submitting the fraud claim because the proof failed to meet the necessary elements of fraud. In order to establish a fraud claim, Superior Oil must prove that the expression was not merely opinion. *Miskimins v. City National Bank of Ft. Smith*, 248 Ark. 1194, 456 S.W.2d 673 (1970). Further, Superior Oil has the burden of proving not only did they not know the true facts, but also that they could not have ascertained the true facts with diligent attention or observance. *Vaught v. Satterfield*, 260 Ark. 544, 542 S.W.2d 502 (1976).

Here, the jury was properly instructed and found against appellant Fulmer on the compressor rental fraud claim. Under Arkansas law, a reviewing court is bound to examine the evidence in the light most favorable to the appellee and is bound to

"is not based on a 'pattern' as that term was elaborated in *Sedima* and *Inryco*, but arises from one engagement to perform one audit[.]" *Id.* at 1421–22. In dismissing a second RICO claim alleging the dissemination of false information, the court held: "Assuming, arguendo, that such a "scheme" existed and that multiple wire or telephone communications were made in its furtherance, it remains apparent that any statements were merely constituents of a single, unified activity. This is not a situation where several distinct torts or crimes are committed over the course of an enterprise; here the court finds only a series of related statements that PAM tries to splinter into several elements of a civil RICO cause of action." *Id.* at 1423.); *Rojas v. First Bank National Association*, 613 F.Supp. 968, 971 n. 1 (E.D.N.Y.1985) (Dicta stating that a " 'pattern' requires a showing of at least two acts of racketeering activity and the threat of continuing activity. * * * Plaintiffs' allegations, arising out of two discrete transactions with defendant, fall far short of establishing a pattern within the meaning of the RICO statute."); *Morgan v. Bank of Waukegan*, 615 F.Supp. 836 (N.D.Ill.1985) (Court dismisses RICO complaint alleging that sale of twenty percent interest in

certain drugstores was part of a scheme to divest plaintiffs of their investment and their security interest, holding that, even if the allegation of fraud was true, this single scheme failed to demonstrate a "pattern of racketeering activity."); *Cullen v. Nassau County Republican Committee*, II RICO Law Rptr. 564 (E.D.N.Y.1985) (In a section 1962(c) action alleging that Republican party officials engaged in a pattern of extortion, the court instructed the jury that "[t]o establish a pattern of illegal activity, it is not enough that plaintiffs show at least two crimes of extortion * * * plaintiffs must also show that the crimes constituted part of a larger pattern of criminal activity[.]").

9. The appellants also contend that the RICO damages were duplicative of the conversion damages and, thus, constitute double recovery for the same injury-conversion of natural gas—contrary to traditional damages' theory. *See Greenwood Ranches, Inc. v. Skie Const. Co., Inc.*, 629 F.2d 518 (8th Cir.1980). Although there may be some merit to this claim, we need not reach the question in light of our holding that Superior Oil failed to prove RICO's "pattern" element.

sustain the jury verdict if there is any substantial evidence to support it. *DeWitt v. Brown*, 669 F.2d 516 (8th Cir.1982). Accordingly, we find from the record that there is substantial evidence to support the jury's verdict of $26,397.70 for fraud and that decision will not be disturbed. In sum, we affirm the wrongful conversion award of $145,125.00 against Fulmer, Branch and Nichols, affirm the fraud award of $26,397.70 against Fulmer, and vacate the $25,000.00 RICO award.

Affirmed in part and reversed in part.