Albert M. GARBADE, Jr., on behalf of himself and all other stockholders of Great Divide Mining and Milling Corporation, Plaintiff,

v.

GREAT DIVIDE MINING AND MILLING CORPORATION, a Colorado corporation, and Milton Levin, Defendants.

Civ. A. No. 85–K–2191.

United States District Court,
D. Colorado.

Oct. 14, 1986.

plaint alleges seventeen claims for relief. The first two claims are for civil violations of 18 U.S.C. §§ 1962(a) and 1962(c), provisions of the Racketeer Influenced and Corrupt Organizations Act. The remaining fifteen claims arise under the Colorado Revised Statutes or under the common law. Jurisdiction is asserted under 18 U.S.C. §§ 1964(a) and 1964(c), 28 U.S.C. § 1331(a), 28 U.S.C. § 1337, and the doctrine of pendent jurisdiction.

Three motions are pending. The first is defendants' Motion to Dismiss or, Alternatively, Motion for Summary Judgment. In accordance with the court's Order of November 15, 1985, this motion "shall be treated as a motion for summary judgment." The second pending motion is defendants' Motion to Strike. This motion is denied as moot, in consideration of my holding, below, on the summary judgment motion. Finally, defendant Milton Levin has filed a Motion for Order Setting a Shareholder Meeting. In view of my disposition of the summary judgment motion, this last motion is also denied.

## II. *The Motion for Summary Judgment*

### A. *Standards for Decision*

The standards for deciding a motion for summary judgment are well-known and require scant elaboration. Summary judgment is appropriate only in the absence of any genuine issue of material fact. *Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1383 (10th Cir.1980). In determining whether any such issue exists, the pleadings and affidavits are construed in the light most favorable to the party against whom the motion has been made. *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir.1980).

### B. *Facts*

Plaintiff's complaint reveals the following pertinent sequence of events.

In 1944, Albert M. Garbade, Sr., plaintiff's father, incorporated Great Divide under the laws of Colorado. While serving as an officer and director of Great Divide,

F. Kelly Smith, McGuire, Cornwell & Blakey, Denver, Colo., for plaintiff.

John R. Henderson, Vranesh & Raisch, Boulder, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

### I. *Introduction*

This action was brought by Alfred M. Garbade, Jr., a minority shareholder in Great Divide Mining and Milling Corporation, a Colorado corporation. The com-

Garbade, Sr. executed a total of $13,838.53 in loans to the corporation. In 1957, the defendant Levin became a Great Divide stockholder. He was later elected a director and corporate treasurer, and by the early 1970s had become the corporation's majority stockholder.

During the 1960s, Levin also loaned money to the corporation. These loans totalled $103,511.18. Some time after May 18, 1969, Levin accepted 14,000 shares of Great Divide common stock in repayment of $35,000 of the corporation's debt to him. Thus the outstanding corporate debt to Levin was reduced to $68,511.18.

Great Divide had an early history of cash shortages. For this reason, Garbade, Sr. and Levin did not demand repayment of their loans. In 1976, however, Great Divide leased some of its mineral claims to Noranda Exploration, Inc. The lease provided for annual payments to Great Divide of $5,000 in 1976, $7,500 in 1977, $10,000 in 1978, and $15,000 in 1979 and thereafter. Noranda's first payment was made in November 1976.

With cash now flowing into Great Divide's coffers, Levin wrote to Garbade, Sr. concerning Levin's unrepaid loans to the corporation. Levin wanted his $103,511.18. Garbade, Sr. reminded Levin of Garbade, Sr.'s own loans to Great Divide, which antedated the Levin loans but were also still unsatisfied. Garbade, Sr. also claimed Levin was owed only $68,511.18, and further inquired whether Levin would accept additional stock in further repayment. Levin refused. This correspondence was exchanged in April 1977.

In January 1979, Noranda paid Great Divide $15,000 under the lease. Shortly thereafter, Garbade, Sr. became seriously ill. According to ¶ 35 of the complaint,

"Levin secretly caused Great Divide to pay him, Levin, Twelve Thousand Dollars ($12,000.00) on January 27, 1979," shortly following the onset of Garbade, Sr.'s illness. Garbade, Sr. died on February 21, 1979.

On January 2, 1980, Noranda paid $15,000 to Great Divide. On February 7, 1980, Levin again "secretly caused Great Divide to pay him" $12,000. Complaint, at ¶ 42. On January 14, 1981, Levin withdrew $12,000 more from Great Divide,[1] following Noranda's January 7, 1981 $15,000 lease payment. Levin withdrew an additional $5,000 on April 29, 1981.

In May 1981, Levin executed another lease, ostensibly on Great Divide's behalf, with Baumgartner, a different third party.[2] Great Divide received a $15,000 payment under the Baumgartner lease on June 3, 1981. Levin took $15,000 from Great Divide on June 5, 1981. Another $15,000 from this lease was paid to Great Divide on June 4, 1982, and Levin removed $12,500 from Great Divide on that same day.

Meanwhile, on January 4, 1982, Noranda made a lease payment of $9,500 to Great Divide.[3] On January 16, 1982, Levin took $9,842.16 from Great Divide.

Plaintiff further alleges Levin's withdrawal, on or about November 9, 1983, of $8,500 from Great Divide, from which amount he paid $3,000 to himself and $5,000 to a Mr. Katz, a lawyer in his office. Plaintiff believes Levin "continued to cause secret payments to be made to himself from the funds of Great Divide, without approval in fact or in law, after November 1983." Complaint, at ¶ 70.

### C. Analysis

#### 1. Relief under 18 U.S.C. § 1962(a)

Garbade, Jr.'s first claim is brought under 18 U.S.C. § 1962(a). In pertinent part, that statute provides as follows:

---

1. In his affidavit, Levin claims this amount should be $10,000.

2. Plaintiff contends Levin had no authority to represent Great Divide in any such transaction, and further avers Levin did so without corporate or shareholder approval. Plaintiff believes Levin entered into this lease for his own "personal benefit." Complaint, at ¶ 45.

3. Noranda's lease payments were reduced following execution of the Baumgartner lease because the property leased to Baumgartner had formerly been part of the Noranda lease. See Defendants' Memorandum Brief in Support of Motion to Dismiss or for Summary Judgment, at 3.

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

■ This section makes it unlawful "to invest funds derived from a pattern of racketeering activity in an enterprise engaged in interstate commerce." *Saine v. A.I.A., Inc.,* 582 F.Supp. 1299, 1302 (D.Colo.1984). Manifestly, Levin has not invested any funds in Great Divide under the factual allegations of the complaint. Indeed, quite the opposite is alleged. Plaintiff's cause of action is predicated on Levin's *withdrawals* of funds from Great Divide. Levin has therefore not used the funds in question to acquire any interest in Great Divide[4] or to establish or operate Great Divide. The statutory cause of action created by § 1962(a) simply has no bearing on the facts of this case. Plaintiff's first claim for relief is therefore dismissed.[5]

### 2. *Relief under 18 U.S.C. § 1962(c)*

#### a. *Dismissal of Great Divide*

The complaint's second claim for relief is raised under 18 U.S.C. § 1962(c). That statute states, in its entirety:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

■ The claim names Levin and Great Divide as separate "persons" within the meaning of 18 U.S.C. § 1961(3). The claim also charges Great Divide with being an "enterprise" as that term is defined in 18 U.S.C. § 1961(4). Section 1962(c), however, only "makes it unlawful for a 'person' to participate in the affairs of an enterprise through racketeering activity. It does not hold the 'enterprise' itself liable." *Saine v. A.I.A.,* 582 F.Supp. at 1306. Moreover, "§ 1962(c)'s proscription only runs to those employed by or associated with an enterprise." *Id.,* at 1307. A corporation such as Great Divide "cannot logically be employed by or associate with itself." *Id.,* at 1307. I therefore dismiss the § 1962(c) claim insofar as it names Great Divide as a defendant.[6]

#### b. *Pattern of Racketeering Activity*

In *Sedima, S.P.R.L. v. Imrex Company, Inc.,* — U.S. —, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985), the Supreme Court noted the four elements necessary for a violation of § 1962(c) to exist: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. Satisfaction of the first two of these four elements is not questioned. However, assuming *arguendo* the existence of "racketeering activity,"[7]

**4.** In any event, as the majority shareholder of Great Divide, Levin has previously acquired a majority interest in Great Divide. The validity of the acquisition of that interest is not disputed here.

**5.** Dismissal of this first claim for relief (§ 1962(a)) is also warranted on the same grounds as the dismissal of the second claim for relief (§ 1962(c)).

**6.** The same analysis would hold under § 1962(a). *Shared Diagnostic Services, Inc. v.*

*Henningsen,* 602 F.Supp. 428, 430 (E.D.Pa.1984) ("a corporation cannot, at the same time, be both a 'person' and an 'enterprise' under RICO"). Moreover, dismissal of Great Divide as a defendant here means Great Divide is no longer a defendant in any federal claim. Thus the pendent state law claims against Great Divide must also be dismissed. *See* Part III of this Memorandum Opinion and Order.

**7.** The parties have directed the bulk of their discussion on this motion to the question of satisfaction of the "racketeering activity" ele-

there has been no "pattern" of racketeering activity. Since the third element has not been met, the § 1962(c) claim against Levin must be dismissed.[8]

The starting point for determining whether a "pattern" exists is, of course, the RICO statute itself. "Pattern of racketeering activity" is defined in 18 U.S.C. § 1961(5):

> "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.

This statutory language is, unfortunately, not very helpful in the current context. *See Sedima v. Imrex*, 105 S.Ct. at 3287 ("[t]he 'extraordinary' uses to which civil RICO has been put appear to be primarily the result of the breadth of the predicate offenses, ... and the failure of Congress and the courts to develop a meaningful concept of 'pattern'"). The *Sedima* Court did not squarely face the issue either,[9] so I must turn to more specific authority.

In determining whether a pattern of racketeering activity exists, "[t]he number of predicate acts, if more than one, is irrelevant. The question is the nature of the conduct under all of the circumstances." *Torwest DBC, Inc. v. Dick, et al.*, 628 F.Supp. 163, 165 (D.Colo.1986).

In *Torwest*, the defendants Dick, Heinrichs and Pauls, doing business as Vace Securities, contracted with Great-West Life Assurance Company to form Torwest Properties Limited. Torwest's board of directors consisted of Dick, Heinrichs and Pauls, as well as three Great-West appointees. Dick, Heinrichs and Pauls then formed Canusa Investments Limited "for the purpose of secretly acquiring an interest in commercial property known as the Denver Business Center." *Id.*, at 164. Dick, Heinrichs and Pauls then recommended the purchase of DBC to Torwest. On this recommendation, Torwest formed Torwest DBC to acquire and develop DBC. The sale was completed, and the defendants enjoyed a substantial resultant profit. *Id.*, at 164.

On those facts, this court did not find any pattern of racketeering activity. *Id.*, at 165. "Where there is only one purpose, one result, one set of participants, one victim and one method of commission, there is no continuity and, therefore, no pattern of racketeering activity." *Id.*, at 166. In *Torwest*, the single purpose was to obtain a profit on the sale of the commercial property in question. The single result was Torwest DBC's payment of more money for the property than it would have otherwise paid. Moreover, the facts involved only one set of participants and only one victim. Finally, there was only "one method of commission—an elaborate scheme, that included the formation of Canusa and the secret purchase of DBC." *Id.*, at 166.

*Torwest* was antedated by *Miller v. Calvin, et al.*, 647 F.Supp. 199 (D.Colo.1985). There the complaint alleged a pattern of racketeering activity through the commission of mail, wire and securities fraud. The

---

ment. My analysis does not require resolution of that issue, because summary judgment is warranted even assuming a finding of racketeering activity. *See Torwest DBC, Inc. v. Dick, et al.*, 628 F.Supp. 163, 165 (D.Colo.1986). Further, because of my decision on the "pattern" issue, I need not resolve the defendant's other moving grounds.

**8.** The "pattern" analysis is fully determinative of the § 1962(c) claim because there have been no averments of a "collection of unlawful debt." In fact, the corporation's debt to Levin was affirmed by Garbade, Sr. in his April 1977 correspondence with Levin.

**9.** Footnote 14 to the Supreme Court's *Sedima* opinion did engage in some general discussion of the meaning of "pattern." While the footnote did not directly address the situation raised by this motion, it did quote legislative history to the effect that "pattern" is produced by a combination of "continuity plus relationship." S.Rep. No. 91–617, p. 158 (1969). The phrase "continuity plus relationship" has been subsequently oft-quoted as providing a legal impetus to the case developments discussed in the balance of this opinion. *See, e.g., Superior Oil Co. v. Fulmer*, 785 F.2d 252, 255 (8th Cir.1986).

predicate acts allegedly resulted in the dissemination of materially false and misleading information with regard to the preliminary prospectus, the prospectus itself, and the registration statement materials of Calvin Exploration, Inc. Chief Judge Finesilver held:

> We are of the view that while the plaintiffs have alleged multiple "racketeering acts," they have failed to sufficiently allege a pattern of racketeering activity. They have alleged that there was a single fraudulent scheme to promote the sale of CEI common stock in a public offering in August 1980. All of the acts complained of were in furtherance of this single event.

*Id.,* slip op. at 9.

The issue of the existence of a pattern of racketeering activity was resolved in the same manner in *Kamin v. Colorado National Bank of Denver, et al.,* 648 F.Supp. 52 (D.Colo.1986). There, Chief Judge Finesilver wrote: "[T]he occurrence of several predicate acts may not establish a pattern of racketeering activity where those acts are directed towards a single fraudulent scheme." *Id.,* slip op. at 4. Since *Kamin,* the Chief Judge has reiterated this point: "A pattern of racketeering activity requires multiple criminal episodes or schemes, not simply multiple predicate acts to accomplish a single scheme." *J.L. Creech and M.V. Creech Corp. v. Federal Land Bank of Wichita, et al.,* 647 F.Supp. 1097 (D.Colo.1986) (citing *Kamin*).

In *Kamin,* the plaintiff claimed the defendant had improperly induced him "to invest in the equity securities of two bank holding companies...." *Id.,* slip op. at 1. Kamin also claimed the defendant bank had "engaged in four separate instances of fraud in connection with the purchase and sale of the securities." *Id.,* at 1. As the *Kamin* court viewed these allegations,

plaintiff's Complaint sets forth only one fraudulent scheme, which was allegedly accomplished through numerous acts of wire, mail, and securities fraud. The underlying scheme, as set forth in ¶ 1 of plaintiff's Complaint[,] was to induce plaintiff to invest in the equity securities of two bank holding companies. Thus, while plaintiff has alleged several predicate acts, each of those acts is only directed towards a single fraudulent scheme. As such, the Complaint fails to sufficiently allege a pattern of racketeering activity.

*Id.,* at 5.

The Tenth Circuit has not yet ruled on this issue.[10] However, the other federal district courts in this circuit which have considered the issue have taken the same position as this district. For example, in *Grant v. Union Bank, et al.,* 629 F.Supp. 570 (D.Utah 1986), the plaintiff brought suit against the bank for breach of a loan agreement. Like Garbade, Jr., Grant brought two RICO counts. The first RICO count, which the *Grant* court labelled the "prime rate count," alleged "that defendants falsely and fraudulently represented to plaintiff that the interest charged on the Prime-tied loan was based on the bank's 'prime rate,' but that in fact the interest charged was not the bank's lowest commercial rate." *Id.,* at 572.

The second RICO claim in *Grant,* the "SBA loan count," alleged "that defendants falsely and fraudulently represented to plaintiff that they were honestly and in good faith complying with an agreement between the bank and plaintiff concerning a contemplated SBA loan, when in truth and in fact this was part of a scheme to defraud plaintiff." *Id.,* at 572.

The *Grant* court dismissed the SBA loan count because it did not contain the "essential elements of a scheme or artifice to

**10.** The Tenth Circuit's most recent pronouncement on civil RICO came in *Plains Resources, Inc. v. Gable,* 782 F.2d 883, 887 (10th Cir.1986). There the circuit court decided RICO does not require a plaintiff to "aver and prove that the conduct described as racketeering activity be connected to criminal conduct of an organized nature."

defraud." *Id.*, at 576–577, 578. The court was thus "left with the question whether the multiple mail and wire communications [alleged] in furtherance of the prime rate count alone are sufficient to show a 'pattern of racketeering activity.'" *Id.*, at 578. The court was of the opinion that "the concept of 'pattern' under civil RICO cases contemplates multiple transactions or episodes, not just multiple acts to promote the same transaction or episode." *Id.*, at 578. As to the prime rate count, plaintiff alleged "a single transaction between herself and the bank, not multiple criminal episodes or transactions." *Id.*, at 578. The court therefore concluded: "We consider that multiple mail and wire communications in furtherance of that single allegedly fraudulent loan are insufficient to show a pattern under RICO." *Id.*, at 578.

The Kansas district court reached the same result in *Phelps v. Wichita Eagle-Beacon, et al.*, 632 F.Supp. 1164 (D.Kansas 1986). Phelps' action sought "damages and injunctive relief for defendants' publication of two articles about plaintiff in the Wichita Eagle-Beacon." *Id.*, at 1166. One of Phelps' claims was for a civil RICO violation under 18 U.S.C. § 1962.

Even "viewing plaintiff's amended complaint in a light most favorable to the plaintiff," the court did not find the alleged acts "involving mail and wire fraud" formed "a pattern of racketeering activity as required by section 1962." *Id.*, at 1172. In support of this finding, the court stated:

[W]hile many acts may have been undertaken to accomplish publication of said articles, the plaintiff alleges a single fraudulent effort. The acts alleged by plaintiff in plaintiff's amended complaint comprise several telephone conversations and mailings in furtherance of a single ongoing scheme to publish articles about the plaintiff. The court therefore finds that plaintiff's amended complaint alleging a violation of the RICO Act, 18 U.S.C. § 1962 should be dismissed.

*Id.*, at 1172.

*Grant* and *Phelps* relied in part on another federal district court case decided within the Tenth Circuit, *Professional Assets Management, Inc. v. Penn Square Bank, et al.*, 616 F.Supp. 1418 (W.D.Okla. 1985). There, plaintiff Professional Assets Management, Inc. moved to vacate an earlier court order dismissing PAM's § 1962 RICO claims against the defendant Peat, Marwick, Mitchell, and Company. The facts showed PAM's allegations to be primarily concerned with Peat Marwick's preparation and issuance of an audit report of Penn Square Bank. *Id.*, at 1420. Although "[m]any constituent actions were necessary to prepare the audit report, . . . it was a single unified transaction." *Id.*, at 1421. Since "PAM's claim against Peat Marwick is not based on a 'pattern,' . . . but arises simply from one engagement to perform one audit of Penn Square Bank," *id.*, at 1422, the complaint was fatally insufficient, even when "[v]iewed in the light most favorable to PAM." *Id.*, at 1421. Hence the motion to vacate the court's order was denied.

The *Professional Assets Management* opinion reached the same conclusion with respect to a related civil action in which Peat Marwick was named as a defendant in a complaint filed by the receiver of Penn Square Bank. Peat Marwick filed a third-party complaint against several parties, including PAM. PAM counterclaimed against Peat Marwick under 18 U.S.C. § 1962(c), claiming Peat Marwick fraudulently schemed "to disseminate false and misleading information regarding the condition of Penn Square Bank." *Id.*, at 1423, quoting from PAM's counterclaim.

The court dismissed the counterclaim under the following analysis:

The "pattern" here alleged is Peat's "scheme . . . to disseminate false and misleading information regarding the condition of Penn Square Bank." Assuming, arguendo, that such a "scheme" existed and that multiple wire or telephone communications were made in its furtherance, it remains apparent that any statements were merely constituents of a single, unified activity. This is not a situation where several distinct torts or

crimes are committed over the course of an enterprise; here the court finds only a series of related statements that PAM tries to splinter into the several elements of a civil RICO cause of action.

Just as a series of kickback payments did not amount to a pattern in *Inryco* [*Northern Trust Bank/O'Hare v. Inryco, Inc.*, 615 F.Supp. 828 (N.D.Ill.1985)], Peat's sequential representations in furtherance of its alleged "scheme" do not constitute a pattern. The requirements of § 1962(c) are not satisfied through multiplicity in pleading. Count IV of PAM's counterclaim fails to state a claim for relief.

*Id.*, at 1423.

▪ The legal analysis of "pattern of racketeering activity" found in *Torwest; Miller, Kamin, Grant, Phelps,* and *Professional Assets Management* is dispositive of Garbade, Jr.'s § 1962(c) claim against Levin. The nature of Levin's conduct under the circumstances alleged by Garbade, Jr. simply does not reveal a pattern of racketeering activity. *Torwest*, at 165. The complaint sets forth only one fraudulent scheme, namely Levin's secret withdrawal of Great Divide funds in ostensible repayment of the corporation's debt to Levin. The scheme was allegedly accomplished through recurring acts of wire, mail, and transportation fraud. Complaint, at ¶s 76–79. Thus, Garbade, Jr. has alleged several predicate acts. Nevertheless, because the acts are only directed toward a single fraudulent scheme, they do not constitute a pattern of racketeering activity. Viewed in a light most favorable to Garbade, Jr., the complaint's second claim for relief fails to present any genuine issues of material fact. The claim is legally deficient and will be dismissed.[11]

▪ The plaintiff's complaint appears, on its face, to allege an additional fraudulent scheme in that "Levin used the United States mails and/or interstate telephone lines, on more than one occasion, to negotiate and procure the Baumgartner Lease, and to misrepresent his authority to enter into the Baumgartner Lease on behalf of the Corporation." Complaint, at ¶ 47. Use of the mails and/or the telephone lines invokes the predicate acts of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343). Those two statutes federalize any "scheme or artifice to defraud" where the mails or wires are used "for the purpose of executing such scheme or artifice."

▪ If indeed ¶ 47 of the complaint raises an additional fraudulent scheme on Levin's part, then the presence of two allegedly fraudulent transactions might, taken together, present a question of fact as to the existence of a pattern of racketeering activity. *Grant v. Union Bank*, 629 F.Supp. at 578. Paragraph 47, however, makes only conclusory allegations of a scheme to defraud. The specific intent necessary to commit fraud under §§ 1341 and 1343 is missing from that paragraph. *See Grant*, at 576; *Saine*, at 1303.

▪ Moreover, plaintiff will not be granted leave to amend his complaint in this regard because Levin's acts in executing the lease itself do not constitute a "scheme or artifice to defraud" insofar as Garbade, Jr. is concerned. The alleged fraudulent misrepresentations which Levin made through the mails and/or the wires in connection with execution of the Baumgartner lease were made, if at all, to Baumgart-

---

11. I recognize a split among the lower federal courts regarding the proper interpretation of "pattern of racketeering activity" under RICO. *Compare,* for example, *Superior Oil Company v. Fulmer*, 785 F.2d 252, 257–258 (8th Cir.1986) (taking the *Kamin*-type of position on the issue); *B.J. Skin & Nail Care, Inc. v. International Cosmetic Exchange, Inc.*, 641 F.Supp. 563 (D.Conn.1986) (same); *Allington v. Carpenter*, 619 F.Supp. 474, 478 (C.D.Cal.1985) (same); *Northern Trust Bank/O'Hare v. Inryco, Inc.*, 615 F.Supp. 828, 831–833 (N.D.Ill.1985) (same) *with Bush Development Corporation v. Harbour Place Associates*, 632 F.Supp. 1359, 1365–1366 (E.D. Va.1986) (disagreeing with *Allington* and *Inryco*); *Trak Microcomputer Corporation v. Wearne Brothers, et al.*, 628 F.Supp. 1089, 1096 (N.D.Ill.1985) (same as *Bush*). Whatever the eventual outcome on this schism, I choose to adopt the position taken by the district courts of this circuit.

ner,[12] and not to plaintiff. Garbade, Jr. has made no showing of injury by virtue of execution of the lease. Indeed he cannot make any such showing, because execution of the lease *per se* worked no fraud on him.[13]

Thus, the Baumgartner lease itself has not harmed plaintiff. Rather, plaintiff objects to Levin's secret removal of money from Great Divide. Therefore, only one fraudulent scheme has been alleged. The fact that the source of the money Levin withdrew from Great Divide derives from either the Baumgartner lease or the Noranda lease does not change this result. To the contrary, since under the pleaded facts these two leases are Great Divide's only sources of income, Levin could not withdraw any significant amount of money from Great Divide until a lease payment had been made. The source of the money withdrawn and the timing of the withdrawals are mere incidental components of the single fraudulent scheme to withdraw money from Great Divide in repayment of the corporate debt owed to Levin. Like the DBC property in *Torwest*, the Baumgartner lease is nothing more than a vehicle which partially enabled the defendant to bring his single fraudulent scheme to fruition. That vehicle does not itself constitute an additional fraudulent scheme. Therefore, ¶ 47 of plaintiff's complaint does not salvage the § 1962(c) claim for relief.

### III. *The Pendent Claims*

Having found summary judgment to be warranted on the only two federal question claims in the complaint, dismissal of the pendent state claims must follow. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). *See Phelps v. Wichita Eagle-Beacon*, at 1172 (no jurisdiction to hear plaintiff's pendent state law claims following dismissal of the RICO claims); *Grant v. Union Bank*, at 579 (following dismissal of RICO claims,

---

**12.** Baumgartner is not a party to this action.

**13.** Plaintiff has no standing to raise a fraud claim, at least for RICO purposes, with respect

pendent claims dismissed without prejudice).

### IV. *Order*

IT IS ORDERED:

(1) Defendants' Motion to Strike is denied as moot.

(2) Defendants' Motion for Summary Judgment is granted, and the complaint in this case is dismissed. The two RICO claims are dismissed with prejudice. The remaining state law claims are dismissed without prejudice.

(3) Defendants' Motion for Order Setting a Shareholder Meeting is denied without prejudice.

to the Baumgartner lease itself. *See Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).