800 F.2d 205
 RICO Bus.Disp.Guide 6360
 Douglas A. HOLMBERG, Appellee,
v.
Rodney C. MORRISETTE and Mintex Corporation, a Minnesota
corporation, Appellants.
Douglas A. HOLMBERG, Appellee,
v.
Rodney C. MORRISETTE and Mintex Corporation, a Minnesota
corporation, Appellants.
 Nos. 85-5138, 85-5221.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 10, 1985.
Decided Sept. 3, 1986.
 
 Mark R. Miller, Minneapolis, Minn., for appellants.
 Joseph W. Anthony, Minneapolis, Minn., for appellee.
 Before ROSS, Circuit Judge, BRIGHT, Senior Circuit Judge, and BOWMAN, Circuit Judge.
 BOWMAN, Circuit Judge.
 
 
 1
 This appeal is from a judgment entered after a bench trial finding defendants Rodney C. Morrisette and Mintex Corp. (Mintex) liable for treble damages under the Organized Crime Control Act of 1970, Title IX (Racketeer Influenced and Corrupt Organizations), 18 U.S.C. Secs. 1961-1968 (as amended) (RICO), and for actual and punitive damages under two common-law counts for fraud and conversion for submitting falsified documentation to draw down a letter of credit provided by Douglas A. Holmberg, the plaintiff in this action. The District Court awarded Holmberg $375,000 in damages, $4,478 in costs, and $35,383 in attorneys' fees. We affirm the District Court's finding of liability for actual and punitive damages on the fraud and conversion claims. We reverse the finding of liability on the RICO claim and the award of attorneys' fees, and remand for a determination of the amount of damages Holmberg should recover with respect to his state law claims.
 
 I.
 
 2
 This case arose from a series of business transactions between an American manufacturer, an American exporter, and a Nigerian buyer. Mintex, a Minnesota corporation, produces wall plaques and other commemorative materials. Morrisette, a Florida resident, is president of and holds fifty percent of the shares of Mintex. Trans World Services, Inc. (Trans World) is a Minnesota corporation engaged in export trading. Typically, Trans World provided security for its purchases of goods by obtaining a letter of credit from a third party, such as plaintiff Douglas A. Holmberg in this case. Trans World would be the initial beneficiary of the letter of credit, but then would transfer it to the benefit of a domestic supplier to secure the transaction. If the buyer did not pay Trans World for the goods and Trans World in turn did not pay the supplier, the latter could use the letter of credit to obtain payment.
 
 
 3
 In September and October 1981, Mintex agreed to supply Trans World with certain commemorative plaques destined for shipment to a Nigerian importer, G.N.A. Hamzer & Co. (Hamzer). Trans World was to secure the purchase with a letter of credit, but Mintex reserved the right to accept or reject the terms of the letter of credit. In September, Holmberg agreed to furnish Trans World a letter of credit for $125,000 in exchange for a portion of Trans World's profits on its sales of the plaques. In October, Holmberg bought an irrevocable, unconditional, and transferable letter of credit naming Trans World as the beneficiary.
 
 
 4
 Trans World soon began placing orders with Mintex. By mid-December, Mintex had produced $65,232 worth of plaques that were shipped to Hamzer in Nigeria. From February 1982 through May 1982, Mintex produced $264,021 worth of goods that Trans World shipped to Wood Dale, Illinois for storage. Mintex lacked purchase orders from Trans World for $112,956 of these goods, and $71,540 of the goods were designated for RJC Enterprises, of which Morrisette was a part owner.
 
 
 5
 Holmberg's first letter of credit expired in April 1982 without being cashed. In July, Trans World requested and Holmberg provided another $125,000 letter of credit designating Trans World as the beneficiary. Trans World forwarded the letter of credit to defendants, who requested an alteration in the terms of the letter of credit. Rather than requiring an ocean bill of lading, Morrisette wanted to change the terms to "any bill of lading." The parties finally compromised on allowing either an air or ocean bill of lading. Payment on the letter of credit was predicated on shipment of the goods to Hamzer, which was completely at Trans World's discretion, and defendants could not draw down the letter of credit until a fixed time after the goods had been shipped. Trans World could decide, for whatever reason, not to ship the goods to Hamzer and not to pay Mintex, leaving Mintex without recourse against the letter of credit.
 
 
 6
 In August, Trans World agreed to transfer Holmberg's letter of credit to Mintex as beneficiary and to name Mintex as beneficiary on a $25,000 letter of credit that Gilbert Watson obtained from a Minnesota bank. In late August, Mintex sent a letter through the United States mail to Holmberg's bank in Miami, Florida requesting transfer of the letter of credit from Trans World to Mintex. Morrisette and the Miami bank had at least one telephone conversation concerning this transfer. In September, defendants sent a request via Federal Express to Holmberg's bank requesting payment of the letter of credit. The documents submitted by them indicated that $193,964 worth of plaques had been manufactured and shipped to Hamzer in October and November 1981. The bank concluded that the documents complied with the letter of credit and paid Mintex $125,000.
 
 
 7
 In fact, the documents were false and misleading. Trans World had shipped only $65,232 worth of goods to Hamzer by September 1982, and this was known to Mintex. Hamzer was a customer of Trans World, not Mintex, and thus owed Trans World for the goods shipped. Hamzer certainly did not owe Mintex the $193,964 claimed on the documents accompanying the letter of credit. Morrisette admitted at trial that the corresponding invoices designating Hamzer rather than Trans World as the buyer were not created until August or September 1982, though Mintex back-dated them to October and November 1981. Moreover, the attached air bills of lading did not correspond to the invoices, but had been altered to conceal the actual amount of goods shipped so that no one would notice the discrepancy in dollar value between the invoices and the air bills.
 
 
 8
 Mintex also drew down two other letters of credit related to the transactions at issue here. In September 1981, Peter DeJongh purchased a $25,000 letter of credit through a Minnesota bank. Mintex eventually was made the beneficiary of this letter of credit, and was entitled to draw down upon it by presenting an ocean bill of lading showing shipment of goods to Nigeria and associated invoices. In June 1982, Morrisette requested and received payment of this letter of credit in person by presenting invoices from Trans World and bills of lading. As previously noted, in August 1982, Mintex was also named the beneficiary of Watson's $25,000 letter of credit, which had been issued to Trans World in August 1981. Between April and mid-October 1982, Morrisette and Watson's bank had numerous telephone conversations and several exchanges of correspondence through the United States mail concerning Morrisette's efforts first to transfer and then to draw down Watson's letter of credit. On October 15, 1982, Morrisette presented the bank with documents showing shipment of over $25,000 in goods and received $25,000 in payment.
 
 
 9
 Concurrent with these actions, on October 9, 1982, Mintex commenced a replevin action in Illinois to recover the $264,021 worth of goods Trans World had stored in Wood Dale.[1] In its complaint, Mintex represented that it owned the goods.
 
 
 10
 In his complaint in this case, Holmberg alleged that Morrisette and Mintex had: (1) committed common-law fraud in drawing down Holmberg's letter of credit; (2) converted Holmberg's funds; (3) engaged in a pattern and practice of racketeering activity in violation of RICO; and (4) acted with willful indifference to Holmberg's rights and were therefore liable for punitive damages. He sought actual damages of $125,000 under each of the first two counts. He also claimed the same amount under the RICO count, which would be trebled under that statute to $375,000. Finally, Holmberg sought punitive damages as well as attorneys' fees, costs, and interest.
 
 
 11
 After a bench trial, the District Court concluded that Holmberg had prevailed against defendants on all four counts of the complaint. As to the common-law fraud claim, the court concluded that defendants fraudulently collected payment on Holmberg's letter of credit "by knowingly presenting materially false and misleading documents to [Holmberg's b]ank with the intent that the bank would rely on the false documents to pay the proceeds of Holmberg's [letter of credit]. The ... [b]ank did rely on the presented documents and, as a result, paid out on Holmberg's [letter of credit]," thereby damaging Holmberg. Holmberg v. Morrisette, No. 3-83-1383, at 23 (D.Minn. Feb. 1, 1985). The District Court similarly found that defendants' presentation of fraudulent documents to Holmberg's bank constituted a conversion of Holmberg's funds. Damages were set at $125,000 for each count plus costs, attorneys' fees, and interest. The District Court also found that defendants had acted with willful indifference to Holmberg's rights and that Holmberg was entitled to $250,000 in punitive damages.
 
 
 12
 The District Court found defendants liable under RICO for conducting a pattern of racketeering predicated on mail and wire fraud. The District Court specifically relied on defendants' having obtained payment of the Holmberg, Watson, and DeJongh letters of credit by using the United States mail to submit fraudulent documents and a telephone to make communications in connection with those transactions. On the RICO claim, the court awarded Holmberg $375,000 (treble damages) plus costs, attorneys' fees, and interest. The court then concluded that Holmberg's damages under the RICO claim subsumed his damages under the fraud, conversion, and punitive damages claims and thus finally awarded Holmberg a total of $375,000 in damages, $4,478 in costs, and $35,181 in attorneys' fees. The court noted that should the RICO award be overturned on appeal, the damages on the fraud and conversion claims should be awarded only to the extent that they are not duplicative.
 
 
 13
 Defendants now assert numerous grounds for reversing all or part of the District Court's judgment. They first contend that the District Court erred in finding liability under RICO because Holmberg failed to prove defendants engaged in mail or wire fraud. They also assert that even if Holmberg proved the necessary acts under 18 U.S.C. Sec. 1961, those acts do not amount to a pattern of racketeering as required under RICO.[2] Defendants next argue that the District Court's finding that they fraudulently drew down Holmberg's letter of credit is clearly erroneous. Moreover, they contend that the District Court should have barred Holmberg's claim under the clean hands doctrine. Defendants further assert that, as a matter of law, Holmberg was not entitled to punitive damages. Finally they argue that Holmberg was not entitled to attorneys' fees under either the RICO or the common-law claims.[3]
 
 II.
 A.
 
 14
 Defendants contend that Holmberg failed to prove that they engaged in a pattern of racketeering activity as required under RICO, 18 U.S.C. Sec. 1962(c).[4] We agree. A violation of section 1962(c) "requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., --- U.S. ----, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (footnote omitted). Assuming that Holmberg established that defendants engaged in "conduct of an enterprise" and that the conduct amounted to "racketeering activity," we nevertheless believe that defendants' actions do not constitute the requisite "pattern" of racketeering activity.
 
 
 15
 This Court thoroughly discussed the parameters of "pattern" in Superior Oil Co. v. Fulmer, 785 F.2d 252 (8th Cir.1986). In Superior Oil, we held that several related acts of mail and wire fraud as part of a single scheme to divert natural gas from Superior Oil's pipeline did not amount to a pattern of racketeering activity. There was no evidence suggesting that such activities had occurred previously or that the individuals involved were engaged in other criminal activities. Id. at 257. We believe that the present case is legally indistinguishable from Superior Oil.
 
 
 16
 Under RICO, a pattern "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity...." 18 U.S.C. Sec. 1961(5). Congress further expressed its views of the interrelationship necessary for actions to constitute a pattern:
 
 
 17
 The concept of "pattern" is essential to the operation of the statute.... The target of [RICO] is ... not sporadic activity. The infiltration of legitimate business normally requires more than one "racketeering activity" and the threat of continuing activity to be effective. It is this factor of continuity plus relationship which combines to produce a pattern.
 
 
 18
 S.Rep. No. 617, 91st Cong.2d Sess. 158 (1969), quoted in United States v. Dean, 647 F.2d 779, 792 n. 32 (8th Cir.1981), cert. denied, 456 U.S. 1006, 102 S.Ct. 2296, 73 L.Ed.2d 1300 (1982). The Supreme Court cited this report in Sedima, 105 S.Ct. at 3285 n. 14, prefacing it with the observation that "[t]he implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a 'pattern.' The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern." Id. The Court went on to note that the sponsor of the Senate bill pointed out that "pattern" requires a relationship between the actions. Id. (citing 116 Cong.Rec. 18940 (1970) (statement of Sen. McClellan)). Elsewhere in the Omnibus Crime Control Act of 1970, Congress provided that "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. Sec. 3575(e). The Supreme Court expressly approved use of this definition as an aid to interpreting "pattern" under RICO. Sedima, 105 S.Ct. at 3285 n. 14.
 
 
 19
 We assume for purposes of our review that Holmberg proved that defendants committed acts of wire or mail fraud related to a common purpose or scheme. Our review of the record convinces us, however, that Holmberg has failed, as a matter of law, to prove the continuity necessary to form a "pattern" of racketeering activity. Defendants' actions comprised one scheme to draw down the three letters of credit securing Mintex's transactions with Trans World with respect to goods specially produced by Mintex for shipment to Nigeria. In one sense, defendants' actions were a misguided attempt to obtain payment for goods which they had produced, yet over which they had lost control. There was no evidence that Mintex or Morrisette had engaged in like activities in the past or that they were engaged in other criminal activities. As we observed in Superior Oil, " '[i]t places a real strain on the language to speak of a single fraudulent effort, implemented by several fraudulent acts, as a "pattern of racketeering activity." ' " 785 F.2d at 257 (citing Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc., 615 F.Supp. 828, 831 (N.D.Ill.1985)) (footnote omitted). Thus we reverse the judgment for Holmberg on his RICO claim.
 
 B.
 
 20
 Defendants argue that the District Court erred in concluding that Morrisette fraudulently drew down Holmberg's letter of credit. In support of their argument, they contend that Holmberg wrongfully changed the letter of credit from a "sales" to a "stand-by" letter of credit. Defendants also argue that the nature of the letter of credit was ambiguous and that this ambiguity should be construed against Holmberg, who gave his bank specific language to be included in the document and who in that respect was the draftsman of the instrument. In addition, they assert that the arrangement between Trans World and Holmberg, including Holmberg's alleged power to approve or authorize the shipment of goods to Nigeria, constituted a joint venture. Accordingly, defendants argue that Holmberg cannot take refuge behind the letter of credit, since he was liable to them as a purchaser of the goods. They urge this Court to look beyond the form of the transaction and to consider the purpose of the letter of credit, which was to preserve the beneficiary's (Mintex's) right to payment for the goods it produced and sold to Trans World.
 
 
 21
 We may review de novo the District Court's determination that the facts as he found them constituted actionable fraud. Because the elements of common-law fraud are a matter of state substantive law, we look to the law of Minnesota. Hanson v. Ford Motor Co., 278 F.2d 586, 590 (8th Cir.1960). Applying Minnesota law to the facts of this case, we agree with the District Court that Holmberg established all the elements of the tort of fraud. Davis v. Re-Trac Manufacturing Corp., 276 Minn. 116, 149 N.W.2d 37, 38-39 (1967), citing Hanson, 278 F.2d at 591. Defendants knowingly made material, false representations about past and present facts, intending that Holmberg's bank act upon those representations by making payment upon Holmberg's letter of credit. The bank accepted the falsified documents that defendants presented and in reliance on them paid defendants $125,000. Accordingly, Holmberg, who then was obligated to repay the bank, suffered injury that was the proximate result of defendants' intentional misrepresentations.
 
 
 22
 Whatever ambiguity there may have been in the terms of Holmberg's letter of credit, it could not provide a sufficient justification for submitting falsified documents to draw down the letter of credit. The same conclusion applies to defendants' argument that Trans World and Holmberg were engaged in a joint venture and also to their argument calling upon us to look to the purpose of the letter of credit. The District Court specifically found that Trans World, Holmberg, and Hamzer did not constitute a joint venture, a finding that is not clearly erroneous. Moreover, even if we assume that the joint venture and purpose arguments are correct, at most they would suggest that defendants had a cause of action against Trans World and Holmberg for the price of the goods; they cannot shield defendants from liability for the fraud they committed in wrongfully obtaining payment on the letter of credit. We therefore affirm the judgment in Holmberg's favor on his fraud and conversion claims.
 
 C.
 
 23
 In a closely related contention, defendants assert that the District Court erred in not barring Holmberg's claims as a matter of law under the clean hands doctrine. The District Court found that Holmberg acted in good faith and did not have unclean hands. These are factual findings. Our review of the record satisfies us that they are not clearly erroneous. Thus, we need not explore the interesting question, which the parties did not raise, of whether Minnesota law permits application of the clean hands doctrine, traditionally an equitable defense, in an action at law for money damages. See generally D. Dobbs, Law of Remedies 45-47 (1973).
 
 D.
 
 24
 Defendants contend that Holmberg is not entitled to punitive damages. Under Minnesota law punitive damages are allowable in civil actions "only upon clear and convincing evidence that the acts of the defendant show a willful indifference to the rights or safety of others." Minn.Stat. Sec. 549.20(1). The statute adds that any award of punitive damages is to be measured by a series of factors bearing on the purpose of punitive damages, including the profitability to the defendant of his conduct, the duration of the conduct, the financial condition of the defendant, and the total effect of other punishment imposed on the defendant (e.g., actual damages, costs, and attorneys' fees). Id. Sec. 549.20(3). In this context, the Minnesota Supreme Court has held that "[i]n reviewing an order of the trial court, we are confined to an examination of the record to ascertain whether there is evidence to sustain the judge's action." Melina v. Chaplin, 327 N.W.2d 19, 20 (Minn.1982).
 
 
 25
 In the present case, we find there is substantial evidence in the record to support the District Court's determination that punitive damages are allowable. We are concerned, however, that the amount of the punitive damage award may be excessive, and especially so in view of our reversal of the judgment for Holmberg on his RICO claim. Accordingly, on remand the District Court should reconsider the amount of the punitive damage award in light of this opinion and the statutory factors.
 
 E.
 
 26
 Defendants argue that the District Court erred in granting Holmberg's request for attorneys' fees. We agree. The District Court awarded attorneys' fees under the RICO claim and also under the state law fraud and conversion claims. Obviously, in light of our prior disposition of the RICO claim, Holmberg is not entitled to attorneys' fees under 18 U.S.C. Sec. 1964(c). Because under our decision Holmberg has prevailed only on his state law claims, we look to Minnesota law to resolve the issue of attorneys' fees. See United States ex rel. Garrett v. Midwest Construction Co., 619 F.2d 349, 353 (5th Cir.1980).
 
 
 27
 The Minnesota Supreme Court long and consistently has held "that attorney fees are not recoverable in litigation unless there is a specific contract permitting or a statute authorizing such recovery." Barr/Nelson, Inc. v. Tonto's, Inc., 336 N.W.2d 46, 53 (Minn.1983); Jacobs v. Rosemount Dodge-Winnebago South, 310 N.W.2d 71, 79 (Minn.1981). Holmberg has not referred us to any contract or statute (other than RICO) authorizing his recovery of attorneys' fees. The District Court's judgment does not indicate on what basis or under what authority attorneys' fees were awarded with respect to the state law claims. Accordingly, we do not see any basis for departing from the Minnesota Supreme Court's traditional rule, and therefore we reverse the award of attorneys' fees to Holmberg.
 
 III.
 
 28
 For the reasons set forth above, we reverse the District Court's judgment for Holmberg on the RICO claim and the award of attorneys' fees. We affirm the District Court's finding of liability on the fraud, conversion, and punitive damages claims, and we remand the case for a new determination of the damages that Holmberg should recover on those claims. In so doing, we note that a recovery of compensatory damages on both the fraud and conversion claims clearly would be duplicative and should not be allowed. Holmberg has suffered only one injury--the wrongful drawing down of his letter of credit--and is entitled to be compensated for that injury only once. Similar reasoning applies to the question of punitive damages on both the fraud and conversion claims. Fraud and conversion are separate legal theories of liability, but in reality defendants have injured Holmberg only once. Accordingly, they are to be punished only once, not as many times as there are separate legal theories that have been found to fit the case.
 
 
 29
 Affirmed in part, reversed in part, and remanded.
 
 
 
 [1]
 We note that the value of the goods to Mintex, absent shipment to Hamzer, would have been only a small fraction of the invoiced price. These goods consisted of commemorative plaques for use in connection with a specific Nigerian presidential election and their value depended on the timeliness of their delivery to Nigeria
 
 
 [2]
 Defendants raised several other RICO issues in their briefs which, as they later conceded, the Supreme Court since has decided adversely to them in Sedima, S.P.R.L. v. Imrex Co., --- U.S. ----, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). We do not address those issues
 
 
 [3]
 In a related argument, defendants contend that the trial judge should have recused himself from determining attorneys' fees because his son was an associate in the law firm representing Holmberg. This issue is mooted by our decision that the District Court erred in holding that Holmberg is entitled to attorneys' fees, so we do not address the merits. We observe in passing that the District Court appears to have complied with the applicable law. See United States ex rel. Weinberger v. Equifax, Inc., 557 F.2d 456, 463-64 (5th Cir.1977), cert. denied, 434 U.S. 1035, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978)
 
 
 [4]
 Defendants also argue that Holmberg failed to prove they committed two or more acts of mail or wire fraud. We do not reach this argument because of our disposition of the RICO "pattern of racketeering activity" issue