ATLAS PILE DRIVING CO. and Olson Concrete Company, Plaintiffs,

v.

DiCON FINANCIAL CO. LIMITED PARTNERSHIP, Lake Minnetonka Homes, Inc., and Richard Conry, Defendants.

No. 3–85 CIV 1850.

United States District Court,
D. Minnesota,
Third Division.

March 24, 1988.

Koenig, Robin, Johnson & Wood by Peter W. Johnson, Wayzata, Minn., for plaintiffs.

Brenner, Workinger & Thompson, P.A. by Louis W. Brenner, Minneapolis, Minn., for defendants.

## ORDER

ALSOP, Chief Judge.

The above-entitled matter came on for trial on November 2, 1987. Testimony was closed on November 23, 1987. The court conducted a charge conference with the parties' attorneys on November 24 and 25. Following Thanksgiving break, court was reconvened on Monday, November 30, for closing arguments. The court charged the jury the morning of December 1 and the case was submitted to the jury just prior to lunch on that same day. The jury returned with a completed verdict form the afternoon of December 1, 1987.

The jury concluded that all of the defendants were liable to each of the plaintiffs based upon defendants' violation of 18 U.S. C. § 1962(a), (c) and (d). The jury further concluded that Atlas Pile Driving Company ("Atlas") sustained damages totaling $24,935.00 and plaintiff Olson Concrete Company ("Olson") sustained damages totaling $25,522.33.

The instant case is now before the court on defendants' motion for judgment notwithstanding the verdict ("JNOV") or alternatively for new trial pursuant to Fed.R. Civ.P. 50 and 59, respectively.

## I. BACKGROUND.

In order to adequately address defendants' numerous and farreaching objections to the jury verdict, opposing counsel's conduct and the court's conduct and rulings, the court feels compelled to review in some detail the evidence presented at trial.[1] In so doing, the court will view the evidence in a light most favorable to the plaintiffs and give the plaintiffs the benefit of all reasonable inferences that can be drawn from such evidence. *McGee v. South Pemiscot School Dist. R-V,* 712 F.2d 339, 343 (8th Cir.1983).

A logical starting point to understanding the rather complicated business transactions that gave rise to this lawsuit is the introduction of the participants. Plaintiff Atlas is a subcontractor that installs specialized foundations for residential, commercial and other structures. Plaintiff Olson is a concrete subcontractor. Defendant Richard Conry owns and controls defendant Lake Minnetonka Homes ("LMH"), a real estate development company in the business of acting as a general contractor on residential construction projects. Richard Conry also owns and controls American Engineering Services ("AES"), a carpentry subcontracting company. LMH is a general partner of defendant DiCon Financial Company Limited Partnership ("DiCon"), owning 99.9% of the company. DiCon is a lender to companies that develop real property. Curtis Anderson is an employee of AES, first as a carpenter and then during the time period relevant to this lawsuit as an on-site carpenter supervisor. In addition, Anderson owned and controlled Curtis Anderson Construction Company ("CACC") and Stroth Construction Company ("Stroth"). Each of these short-lived companies were real estate development companies in the business of acting as general contractors on residential construction projects.

In September, 1982, Anderson, on behalf of CACC, his newly formed corporation, purchased three lots from LMH which the

---

**1.** The court based its recollection of the evidence upon its trial notes and exhibits. Given the length and complexity of the trial, it is likely that if the court had available a transcript of the trial, it could have recited additional testimony favorable to the plaintiffs.

court will collectively refer to as the Countryside lots. The homes Anderson intended to and actually did construct were upper bracket houses. The Countryside projects were the first attempt by Anderson to act as a general contractor in construction of a residential home other than his personal residence. The purchase price for the three Countryside lots was $40,000.00 per lot, or $120,000.00.

To finance the sale, Anderson obtained a loan from DiCon for $420,000.00, in return for mortgages on the properties. Apparently DiCon funded the land purchase ($120,000.00) and obtained financing from B.T. Investors for part of the cost of construction ($300,000.00). This type of construction financing was referred to as a wrap-around mortgage.

Conry testified that DiCon transferred the funds for the undeveloped lots directly to LMH. Then, according to Conry, LMH transferred these funds back to DiCon, to cover DiCon's original payment. It is unclear from the evidence whether the transfers between DiCon and LMH actually involved a transfer of monies or were merely bookkeeping entries. It is also unclear whether the LMH transfer to DiCon was in the form of a "loan" or "equity."

CACC was undercapitalized from its inception. Its own estimate of the cost to complete all of the Countryside projects was $1,060,000.00. Even taking Anderson at his word, CACC had only $40,000.00 in addition to the $300,000.00 construction loan to be used towards completion of the three Countryside homes.[2] Assuming Anderson had $340,000.00, he was $190,000.00 short of the typical construction loaned obtained by a residential general contractor.[3] CACC had no other assets available to its creditors.

The Countryside construction as a whole began in September, 1982, and ended in August, 1983, although the three Countryside projects were started and completed on different dates. Dependable Heating was one of many subcontractors doing work on two of the three Countryside houses. Prior to doing the work, Thomas Chouinard, the president of Dependable, and one of Dependable's salesmen met with Anderson and Conry concerning bidding on the projects. The bids on the two houses were initially submitted in Richard Conry's name. At the meeting, Conry asked Chouinard to change the name on the bids to Anderson. Upon expressing concern about working with Anderson, Conry reassured Chouinard that Anderson was acting as the general contractor only because Conry was experiencing a family problem.[4] Conry informed Chouinard that he was financing the project and not to worry about payment.

As it turned out, Dependable Heating and most of the other subcontractors who worked on the Countryside homes had reason to be concerned about payment. Anderson lured subcontractors onto the Countryside projects with assurances that their terms of payment would be met. When Anderson failed to pay the subcontractors for work performed, he would reassure them that payment would be made at rough-in or at completion. If a subcontractor was demanding payment and the subcontractor services were still needed to further completion of the houses, Anderson would pay the subcontractor just enough to keep them on the job. When their services were no longer needed, no further payments would be made.

The subcontractors began filing their mechanics liens on the Countryside projects in March, 1983, and continued to file their liens up to and sometimes after the foreclosure sales. On the three Countryside projects, 53 mechanics liens were filed. Di-

---

2. Of the $40,000.00 Anderson claims he had available, $20,000 was loaned to him by private individuals, all of whom were later repaid out of the construction mortgage proceeds.

3. Several witnesses testified that lenders typically loan half the cost of construction to residential general contractors.

4. Conry testified at trial that it was Anderson's decision and his alone to work as a general contractor. Indeed, Conry testified that he attempted to persuade Anderson not to venture out on his own.

Con eventually foreclosed on all three homes following default on the loans by Anderson.

The first foreclosure sale occurred on February 9, 1984, with DiCon bidding the amount of its encumbrance, $161,232.00. The second foreclosure sale occurred on April 5, 1984, with DiCon again bidding the amount of the encumbrance, $166,480.00. The final foreclosure sale occurred on January 8, 1985, with DiCon bidding the amount of its encumbrance, $199,836.00. Some of the subcontractors joined together to redeem the properties foreclosed in the second and third sales, although the redemption merely allowed them to recover a fraction of their losses. As a result of the redemptions, DiCon received the full amount of its original loan plus a rather substantial interest charge.

In addition to receiving the principal plus interest on the redeemed properties and the sale proceeds on the third property, Richard Conry through AES received payment for the carpentry work of AES. Indeed, AES was one of only two subcontractors [5] out of over 50 that was fully compensated for its services. AES received approximately $166,000.00 for work performed on the Countryside projects. Moreover, plaintiffs' carpentry experts testified that AES carpentry charges were substantially inflated. Finally, AES was one of the few, if not the only, subcontractor that was allowed to work on a cost plus basis, in this case cost plus 20%.

In May, 1983, Anderson, on behalf of Stroth, his newly formed corporation, purchased an undeveloped lot from LMH for $210,000.00, which the court will refer to as the St. Alban's property. Although there is a dispute over the value of the property at the time of sale, plaintiff presented evidence at trial establishing a fair market value at the time of sale of $71,000.00.[6] Like the Countryside purchases, Anderson financed the purchase by obtaining a $350,-000.00 loan from DiCon in return for a mortgage on the property. Also similar to the Countryside transaction, DiCon funded the land sale ($210,000.00), while B.T. Investors funded part of the cost of construction ($140,000.00). As previously mentioned, this type of construction financing is referred to in the industry as a wrap-around mortgage.

Again similar to the Countryside transaction, DiCon transferred the $210,000.00 directly to LMH. Then LMH transferred the $210,000.00 back to DiCon to cover DiCon's original payment. As mentioned earlier, it is unclear from the evidence whether any money actually changed hands or whether the transactions were merely bookkeeping entries. It is also unclear whether the LMH transfer to DiCon was in the form a "loan" or "equity."

The St. Alban's loan agreement provided for interest to accrue at a rate of 31.8% per year for the first year of the loan. Between May, 1983, and when actual construction began in March, 1984, $45,000.00 in interest accumulated on the loan. The construction continued from March, 1984, until October, 1985. Anderson again solicited subcontractors to work on the St. Alban's project, assuring that they would be paid according to the terms of their written

---

**5.** Lyman Lumber Company was the other "subcontractor" that was paid in full on both the Countryside and St. Alban's projects. On both of these projects, Lyman provided construction materials to Anderson after the initial lumber companies discontinued delivering construction materials because of lack of payment. The evidence showed that Lyman had a longstanding and close relationship with Richard Conry and LMH.

**6.** Assuming the plaintiffs' value is correct and that the scheme was not exposed, Conry corrected a flaw in the Countryside scheme—that of

redemption. Although Conry stands to gain whether or not the properties are redeemed, Conry has the opportunity to obtain a larger windfall if the undeveloped lot is significantly over valued. The over valuation of that land and the corresponding over valuation of the mortgage makes it unlikely that it will be economically feasible for unpaid subcontractors to redeem. By eliminating the opportunity for redemption, Conry assured himself that DiCon would have the opportunity to sell the home at a substantial windfall following foreclosure, having only invested a small fraction of the cost of construction.

or oral contracts.[7] Again, Anderson failed to pay the subcontractors, or when payment was made it was just enough to persuade the subcontractors to complete their work. The subcontractors began filing their mechanics liens on June 26, 1984, and eventually 19 mechanics liens were filed.

Again AES worked on a cost plus 20% basis and was the only subcontractor other than Lyman Lumber that was paid in full. AES was paid approximately $78,000.00 for work done on the St. Alban's project. Carpentry experts testified that the reasonable value for carpentry subcontractor services on St. Alban's was $38,000.00. The remaining subcontractors went substantially if not completely unpaid.

Plaintiff offered evidence of numerous misrepresentations by Conry and Anderson to several subcontractors who work on the St. Alban's project. Gary Vinge, president of Dependable Excavating, testified that while on the St. Alban's job site Anderson introduced him to an individual he later found out to be Richard Conry. Anderson did not refer to this individual as Richard Conry, and instead indicated that he was a city inspector. Later Vinge had reason to speak with Richard Conry over the telephone, and Conry told him that he was a commercial airline pilot and builder, and that Conry's mother was providing the financing on the St. Alban's project. Finally, Vinge testified that Anderson told him that St. Alban's was a custom home being built for a doctor.

Brad Langerman, owner of Minnesota Roofing, testified that Conry informed him that his mother, as opposed to DiCon, was financing the St. Alban's project.

In September, 1985, after DiCon had foreclosed on all three Countryside projects, Conry informed Bernadette Wildes of Creative Lighting that Anderson was a very good credit risk and had been in business for three or four years. In addition, Ms. Wildes spoke with an individual by the name of Steve upon contacting DiCon by telephone, and Steve reported that Anderson was a very good credit risk. On January 31, 1985, Debra Stowe of Custom Millwork spoke by telephone with an unidentified individual associated with AES who indicated that Anderson was a very good credit risk.

Finally, Ned Stewart of Har–Ned Lumber testified that Anderson told him a person by the name of Emily Wyman had contracted to build the St. Alban's home. Emily Wyman is the former girlfriend of defendant Conry. In addition, upon making a credit inquiry to Conry, Stewart was informed that there was a buyer for the house and that her name was Emily Wyman. Emily Wyman testified at trial that St. Alban's was not being built for her. Conry also told Stewart that he knew of no reason why payment would not be made according to Har–Ned's terms.

Eventually several contractors, including the plaintiffs, forced Stroth into bankruptcy in January, 1986. DiCon continues to be the prioritized creditor with an encumbrance of in excess of $500,000.00.

During both the Countryside and St. Alban's projects, Anderson continued to work as an on-site carpenter supervisor for AES, earning approximately $30,000.00 per year during this time period. Indeed, Anderson worked as an AES employee not only while AES carpenters were on his Countryside and St. Alban's projects, but also worked on other LMH projects while his own homes were languishing and going under. In addition, Anderson paid himself approximately $16,000.00 out of the Countryside mortgage proceeds.

## II. DISCUSSION.

### A. *Judgment Notwithstanding the Verdict.*

Defendants move for JNOV based upon four alternative grounds, which will be addressed individually. The standard for granting JNOV is well-settled. The court must decide as a matter of law whether the evidence was sufficient to create an issue of fact for the jury. *Lane v. Chowning,* 610 F.2d 1385, 1388 (8th Cir.1979). *See generally* 9 C. Wright & A. Miller, *Federal*

---

**7.** Atlas and Olson worked on the St. Alban's house.

*Practice and Procedure,* §§ 2524 and 2536 (1971). In making this determination the court must: a) consider the evidence in the light most favorable to the prevailing party, b) assume that the jury resolved all conflicts of evidence in favor of the prevailing party, c) assume as true all facts which the prevailing party's evidence tended to prove, d) give the prevailing party the benefit of all favorable inferences which may be reasonably drawn from the proven facts, and e) deny the motion if in light of the above reasonable juries could not differ as to the conclusion that could be drawn from the evidence. *See, e.g., McGee v. South Pemiscot School Dist. R-V,* 712 F.2d 339, 343 (8th Cir.1983); *Hanson v. Ford Motor Co.,* 278 F.2d 586, 596 (8th Cir.1960). In addition, one panel of the Eighth Circuit has imposed a further restriction on granting JNOV by stating that as a general proposition only evidence favorable to the non-moving party should be considered. *Dace v. ACF Industries, Inc.,* 722 F.2d 374, 377 (8th Cir.1983).[8]

### 1. Racketeering Activity.

■ Defendants argue that plaintiffs have failed to prove the requisite racketeering activity. While each of the substantive provisions of 18 U.S.C. § 1962 is directed at a particular type of conduct, the provisions have common elements of proof. Under each substantive provision, a plaintiff must show a pattern of racketeering activity. Implicit within this requirement is that a plaintiff must show that a defendant committed two or more acts of racketeering, also referred to as predicate acts.

Section 1961(1) defines what constitutes racketeering activity and included within this definition is mail fraud, which is the racketeering activity alleged by the plaintiffs. Defendants argue that because the court dismissed the plaintiffs' common law claim of fraudulent misrepresentation pursuant to defendants' motion for directed verdict, plaintiffs can no longer establish a claim of mail fraud. This is so, defendants argue, because plaintiffs' mail fraud claims

are based upon a showing of common law fraudulent misrepresentation. Finally, defendants argue that *Brannan v. Eisenstein,* 804 F.2d 1041 (8th Cir.1986) supports this argument.

To establish a claim of fraudulent misrepresentation under Minnesota law, a plaintiff must prove 11 elements, the first of which requires a representation. *See, e.g., Florenzano v. Olson,* 387 N.W.2d 168, 174 n. 4 (Minn.1986); *Davis v. Re-Trac,* 276 Minn. 116, 149 N.W.2d 37, 38–39 (1967). Because plaintiffs conceded that defendants or their officers or employees did not communicate with the plaintiffs, plaintiffs were faced with the obstacle of connecting defendants to the representations of Curtis Anderson. Upon explicit inquiry by the court, plaintiffs chose to rely on conspiracy for this connection, but could not provide the court with any precedent to support their theory of liability. Therefore, in addition to noting that Anderson's promise to pay for future services cannot be a fraudulent misrepresentation, the court indicated it was unpersuaded that Minnesota law allowed plaintiffs to attribute Anderson's representations to defendants using a conspiracy theory. Consequently, the court directed a verdict on plaintiffs' claim of fraudulent misrepresentation.

■ Proving a claim under Minnesota law of common law fraudulent misrepresentation is quite different, however, than establishing a claim under the mail fraud statute. In contrast to the 11 elements of proof to establish fraudulent misrepresentation, the essential elements of mail fraud are willfully and knowingly devising a scheme to defraud and use of the mails for the purpose of executing the scheme to defraud. *United States v. Rabbitt,* 583 F.2d 1014, 1022 (8th Cir.1978). As previously mentioned, Minnesota fraudulent misrepresentation requires a showing of actual representation. No misrepresentation of fact, however, is required to establish a claim of mail fraud. *United States v. McNeive,* 536 F.2d 1245, 1249 n. 10 (8th

---

**8.** Although *Dace* involved a directed verdict, the standard for granting a motion for directed verdict and a motion for JNOV are the same. *See*

*Farner v. Paccar, Inc.,* 562 F.2d 518, 522 (8th Cir.1977).

Cir.1976). Moreover, one can conspire to commit mail fraud, while the court is unaware of any Minnesota case law suggesting the same is true for fraudulent misrepresentation. Finally, the Supreme Court has explicitly stated that the definition of "scheme or artifice to defraud" should not be limited to common law concepts of fraud. *Durland v. United States*, 161 U.S. 306, 312–13, 16 S.Ct. 508, 510–511, 40 L.Ed. 709 (1896). Based upon the above-mentioned distinctions between Minnesota fraudulent misrepresentation and mail fraud, the court's dismissal of the plaintiffs' fraudulent misrepresentation claim would not appear to preclude, as a matter of law, plaintiffs from establishing the elements of mail fraud.

Defendants finally argue that the facts of the present case are indistinguishable from, and therefore controlled by *Brannan*. In *Brannan v. Eisenstein*, 804 F.2d 1041 (8th Cir.1986), plaintiffs were a group of corporate directors and officers who commenced an action against two individuals, both of whom were members of a group of investors that purchased an interest in oil and gas leases from their corporation. The group of investors had previously sued the plaintiffs and their corporation for recision of the sales of the oil and gas leases, contending they were sold in violation of Missouri's Blue Sky laws because they were not registered. A Missouri circuit court granted the investors' motion for summary judgment. Two days later the defendants in the state action filed a motion for leave to file counterclaims, which was denied.

The corporate directors and officers then filed suit in federal court against two of the investors, alleging violations of federal securities laws, RICO, state securities laws, as well as common law fraud. The district court concluded that the state securities and common law fraud claims were precluded by the prior state court judgment. In addition, the court dismissed the federal securities claim because plaintiffs lacked standing.

Plaintiffs' sole remaining claim was their allegation of a RICO violation. The racke-teering activity alleged by plaintiffs were federal securities fraud and wire fraud. Since the court previously affirmed the dismissal of the securities fraud claims, the court concluded that plaintiffs could not rely on this predicate act. Finally, the court stated that:

> The fraudulent scheme alleged by [the plaintiffs] ... consists solely of statements and omissions by [defendants'] in connection with the sales of the securities. Since we have affirmed the dismissal of the securities fraud claims, the same conduct cannot constitute a fraudulent scheme giving rise to a wire fraud claim.

*Id.* at 1047.

Upon close examination of the facts and holding of *Brannan*, it is clear that the holding of *Brannan* does not have the broad sweep defendants suggest. In *Brannan*, the court did not affirm the dismissal of plaintiffs' wire fraud claim because the district court disposed of the common law fraud claim. Instead, as communicated by the above quoted language, the court stated that the same alleged statements and omissions that were insufficient to establish a securities fraud claim could not constitute a wire fraud scheme, especially since the statements and omissions were alleged to be the *sole* basis for the wire fraud scheme.

While the court did not elaborate on the basis for its conclusion, apparently it felt that plaintiffs' wire fraud claim was so closely related or identical to plaintiffs' securities fraud claim, that dismissal of the latter precluded proving the former. The same is not true here. Plaintiffs do not allege that the wrongful conduct supporting their mail fraud claim is identical to the wrongful conduct giving rise to their claim of fraudulent misrepresentation. As was previously noted, proof of plaintiffs' claim of fraudulent misrepresentation is quite different than proving plaintiffs' mail fraud claim. Accordingly, the court rejects defendants' argument that its dismissal of plaintiffs' fraudulent misrepresentation precludes plaintiffs from establishing their mail fraud claim.

2. Pattern of Racketeering Activity.

Next, defendants argue that plaintiffs have failed to prove two illegal schemes. The United States Court of Appeals for the Eighth Circuit has adopted a restrictive interpretation of the pattern requirement. In addition to the universally adopted requirement that a plaintiff must allege and prove several related racketeering or predicate acts in furtherance of a single criminal scheme, the Eighth Circuit requires a plaintiff to allege and prove that a defendant has committed the same or similar racketeering activity in the past, or is engaged in other criminal activities elsewhere. *Superior Oil Co. v. Fulmer*, 785 F.2d 252, 257 (8th Cir.1986) (interpreting continuity plus relationship requirement of *Sedima, S.P.R. L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985)). To satisfy this latter requirement, a plaintiff must allege and prove two or more illegal or criminal schemes.

Although not providing a descriptive definition of what constitutes multiple schemes, the Eighth Circuit has provided a case-by-case definition of what does not constitute multiple criminal schemes through numerous pattern cases decided since *Superior Oil.*[9] *See, e.g., Holmberg v. Morrisette*, 800 F.2d 205 (8th Cir.1986); *Deviries v. Prudential–Bache Securities, Inc.*, 805 F.2d 326 (8th Cir.1986); *Madden v. Gluck*, 815 F.2d 1163 (8th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 86, 98 L.Ed.2d 48 (1987); *Ornest v. Delaware North Co.*, 818 F.2d 651 (8th Cir.1987); *Allright Missouri, Inc. v. Billeter*, 829 F.2d 631 (8th Cir.1987); *H.J., Inc. v. Northwestern Bell Telephone Co.*, 829 F.2d 648 (8th Cir.1987); *Terre Du Lac Assn., Inc. v. Terre Du Lac, Inc.*, 834 F.2d 148 (8th Cir. 1987).

■ These cases instruct that numerous predicate acts occurring over a long period of time do not, standing alone, constitute multiple illegal schemes. *H.J.*, 829 F.2d 648 (8th Cir.1987) (five-year scheme not a pattern); *Ornest*, 818 F.2d 651 (8th Cir. 1987) (eight-year fraudulent scheme to de-

fraud plaintiffs and plaintiff's predecessors of contractual share of vending machine sales commissions not a pattern); *Deviries*, 805 F.2d 326 (8th Cir.1986) (six-year scheme of alleged misrepresentations and churning of investment account not a pattern). In addition, a "vast array of fraudulent activities," including a check-kiting scheme, diversion of corporate assets, defrauding of creditors by preparing and distributing false financial statements and failure to comply with the terms of a financial agreement do not, standing alone, constitute multiple criminal schemes. *Gluck*, 815 F.2d 1163 (8th Cir.1987) *cert. denied*, —— U.S. ——, 108 S.Ct. 86, 98 L.Ed.2d 48 (1987). Finally, even the victimization of multiple individuals or entities does not, standing alone, constitute multiple criminal schemes. *See Gluck*, 815 F.2d 1163 (8th Cir.1987) (victims were employees and creditors of defendant); *Allright Missouri*, 829 F.2d 631 (8th Cir.1987).

The closest the Eighth Circuit has come to providing some of the considerations involved in determining whether conduct constitutes multiple schemes was in *United States v. Kragness* where the court stated:

Here we think it clear that even our more restrictive view of the pattern requirement has been met, for there is evidence of not two but three separate schemes: first, there was a scheme to import marijuana into La Junta; second, there was a cocaine-and-quaalude scheme; and third, there was a scheme to import marijuana into the Phoenix area. The cocaine-and-quaalude project constitutes a separate scheme because, *inter alia*, it involved drugs different from that in the other schemes, a different drug supplier from a different country, a different United States base of operations (Anadarko/Chickasha), different customers, and the participation of a number of persons, such as Benanti and his associates, who were not involved in the marijuana schemes. While the La Junta and Phoenix schemes both involved marijuana from Oaxaca, Mexico,

---

**9.** Unlike the instant case, almost all of the Eighth Circuit pattern cases were decided with-

out the benefit of a fully developed record on motions to dismiss or for summary judgment.

they nonetheless were separate schemes. They involved different United States bases of operation and different methods of smuggling the marijuana into the country (the La Junta marijuana was generally flown directly from Oaxaca to the United States, while the Phoenix marijuana was first driven to a point near the United States border). Further, there were a number of participants in each scheme who took no part in the other. Finally, the two schemes were separated by a substantial period of time; the last La Junta-based drug activities were in early 1981, while the earliest Phoenix activities were in mid-1982. We consequently have little difficulty in concluding that the pattern requirement was met here.

830 F.2d at 858.

■ Defendants characterize plaintiffs' allegations as *one* ongoing scheme to defraud numerous subcontractors occurring over several years, hence there exists no pattern of racketeering activity. The defendants' characterization is overly broad. Indeed, to adopt to defendants' characterization would make the "has committed the same a similar racketeering activity in the past" language of the Eighth Circuit pattern test meaningless. Instead, a reasonable characterization of defendants' conduct is that Conry and Anderson, themselves and through their corporations, implemented a scheme to defraud subcontractors working on the Countryside projects and then implemented a second and separate scheme to defraud subcontractors working on the St. Alban's project.[10] Pursuant to each of these schemes, defendants made numerous mailings.

The best way to illustrate the existence of a second scheme is to contrast the instant case with several cases where the Eighth Circuit has concluded that no pattern existed. An appropriate starting point is *Superior Oil*. In *Superior Oil*, the de-

fendants were accused of converting gas from plaintiff's pipeline. The court stated that "[t]here was no proof that [defendants] had ever done *these* activities in the past." 785 F.2d at 257 (emphasis added). The court further stated that "Superior Oil attempted to show that [defendants] intended to engage in similar gas conversion schemes at other locations," but went on to conclude that there was insufficient proof of the threat of continuing racketeering activity. The clear implication from the above quoted language is that Superior Oil could have shown "continuity" by demonstrating that defendants converted gas from other pipelines.

This is precisely what occurred in the instant case. The St. Alban's project is the equivalent of stealing gas from the second pipeline. Converting gas from a second pipeline would have required a second physical entry into another pipeline. By virtually any standard of comparison, the St. Alban's scheme required more in terms of a second structure or operation. In setting up the St. Alban's scheme, Anderson was forced to incorporate a new general contracting business, solicit subcontractors who had not worked on the Countryside project, and execute new purchase and lending agreements with Conry.

The analytical distinction between *Superior Oil* and the instant case runs through the above cited cases where the Eighth Circuit has found the racketeering activity to lack the necessary continuity. For example, in *Madden*, defendants engaged in a "vast array" of fraudulent activities through the use of mail and wire, such as check-kiting, diversion of corporate assets, and preparing and distributing false financial statements to creditors in order to keep the corporation afloat long enough to divert its assets to defendant's own use. Like *Superior Oil*, the present case is distinguishable from *Madden* because in *Madden* the plaintiff could not point to a second

---

**10.** If Conry and Anderson would have stopped after the Countryside project, then the court would be inclined to agree with the defendants that, although there were three separate houses involved, there was but one illegal scheme to defraud the Countryside subcontractors. This conclusion is supported by the fact that most of the Countryside subcontractors worked on more than one of the Countryside homes, CACC built all of the Countryside homes, and the lot sale transactions and lending arrangements were identical and simultaneous.

corporation controlled by the defendants that defendants kept afloat in order to loot it.

Finally, defendants cite to *Billeter* as being factually indistinguishable from the instant case. In *Billeter*, plaintiff was a limited partner in Downtown Development Associates, Ltd. ("Downtown"), which owned approximately two city blocks of land located in downtown St. Louis. Defendants were general partners of Downtown. Several of the Downtown general partners also owned, controlled and were general partners of a second limited partnership, Riverside Hotel Investors, Ltd. ("Riverside"). Riverside wanted to purchase some of the Downtown land in exchange for an interest in the Riverside partnership. Consent of a majority of the limited partners of Downtown was necessary to convey the property to Riverside. The plaintiff sued defendants, alleging that they made several material misrepresentations and omissions of fact to encourage consent to the exchange.

The court concluded that plaintiff had alleged only a solitary scheme by defendants to wrongfully deprive the Downtown limited partners of their investment in the partnership. The court noted that the fact that the scheme occurred over a number of years (1980–1984) or victimized several individuals and entities comprising the limited partnership does not establish continuous racketeering activity.

Here again, the existence of the St. Alban's project distinguishes the instant case from *Billeter*. The Countryside project is the equivalent of the scheme that occurred in *Billeter*. The court is confident the Eighth Circuit would have found a pattern in *Billeter*, if after the completion of the Downtown/Riverside scheme, defendants in *Billeter* would have established a second limited partnership and carried out similar wrongful conduct. Like the St. Alban's scheme, this hypothetical second limited partnership would require the creation of a new business, the solicitation of limited partners, and a second set of business transactions.

In sum, it is the combination of the Countryside scheme and the separate and distinct St. Alban's scheme that shows that the defendants have "committed the same or similar racketeering activity in the past." Accordingly, the court concludes that there was a jury issue concerning whether plaintiffs showed related and continuous racketeering activity, so as to constitute a pattern in the Eighth Circuit.

3. Enterprise Distinct from the Person.

The substantial majority of the circuits, including the Eighth Circuit, have held that an *entity* enterprise must be distinct from the RICO "person" named as defendants under § 1962(c).[11] *Bennett v. Berg*, 685 F.2d 1053 (8th Cir.1982), *en banc*, 710 F.2d 1361 (1983), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). *But see United States v. Hartley*, 678 F.2d 961 (11th Cir.1982). In the instant case, plaintiffs do not allege that the enterprise is not an entity, but rather an association in fact of LMH, DiCon, AES, CACC, and Stroth.[12] Two of the members of the alleged association in fact enterprise are also "persons" named as defendants—LMH and DiCon. Consequently, the court must address, pursuant to the defendants' request, the issue of whether *Berg* proscribes members of an association in fact of being named as "persons" under § 1962(a) and (c).[13]

*Berg* is factually distinguishable from the instant case on two grounds. First, the court in *Berg* analyzed the enterprise/per-

---

**11.** There are two classes of enterprises: legal entity enterprises, which include individuals, partnerships, corporations, associations or other legal entities, and association-in-fact enterprises. 18 U.S.C. § 1961(4).

**12.** Other circuits have held that a group of corporations may constitute a "group of individuals associated in fact" within the meaning of 1961(4). *See Fustok v. Conticommodity Servic-*

*es, Inc.*, 618 F.Supp. 1074, 1076 n. 1 (S.D.N.Y. 1985).

**13.** It should be noted that even if the court were to rule that *Berg* proscribes naming LMH and DiCon as "persons" under both (a) and (c), plaintiff would still have a valid judgment against Richard Conry, since he was not alleged to be a member of the association in fact enterprise.

son distinction under § 1962(c). In the present case, plaintiffs have obtained a jury verdict not only under § 1962(c), but also under § 1962(a). Second, the enterprise alleged in *Berg* was an entity enterprise, not an association in fact enterprise. The Eighth Circuit has yet to address whether either of these distinctions is relevant when determining whether the person must be distinct from the enterprise. Consequently, it is the task of this court to determine whether either of the above distinctions justify deviation from the holding of *Berg*.

Despite the lack of Eighth Circuit guidance on the issue of whether a member of an association in fact enterprise can also be a person under § 1962(a) and (c), other courts have addressed the issue. *See Haroco v. American National Bank and Trust Co.*, 747 F.2d 384, 401 (7th Cir.1984) (dicta); *Fustok v. Conticommodity Services, Inc.*, 618 F.Supp. 1074, 1075–76 (S.D.N.Y.1985). In *Haroco*, the court *in dicta* stated that:

> Where persons associated 'in fact' for criminal purposes, each person may be held liable under RICO for his, her or its participation in conducting the affairs of the association in fact through a pattern of racketeering activity. But the nebulous association in fact does not itself fall within the RICO definition of 'person.' We doubt that an 'association in fact' can, as such, hold any interest in property or even be brought into court. In the association in fact situation, each participant in the enterprise may be a 'person' liable under RICO, but the association itself cannot be.

*Haroco*, 747 F.2d at 401 (citations omitted).

■ The court is persuaded that a legitimate association in fact enterprise is not merely a synonym for the collection of its individual members, but instead, a distinct entity. Consequently, members of an association in fact enterprise should be considered as "persons" distinct from the enterprise.

With regard to whether the person must be distinct from the enterprise under § 1962(a), several other circuits have considered the issue, and there is a split of authority with the majority of the circuits not requiring the person to be distinct from the enterprise under § 1962(a). *Compare Haroco*, 747 F.2d at 401; *Schofield v. First Commodity Corp.*, 793 F.2d 28, 32 (1st Cir.1986); *B.F. Hirsch v. Enright Refining Co.*, 751 F.2d 628, 633 (3rd Cir.1984); *Welek v. Solomon*, 650 F.Supp. 972, 974 (E.D. Mo.1987); *Klapper v. Commonwealth Realty Trust*, 657 F.Supp. 948, 955 (D.Del. 1987) (and cases cited therein) *with United States v. Computer Sciences Corp.*, 689 F.2d 1181, 1190 (4th Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *Rush v. Oppenheimer & Co., Inc.*, 628 F.Supp. 1188, 1196 (S.D.N.Y.1985); *H.J. Inc. v. Northwestern Bell Telephone Co.*, 648 F.Supp. 419, 427 (D.Minn.1985), *aff'd on other grounds*, 829 F.2d 648 (8th Cir.1987).

Most courts not requiring the person to be distinct from the enterprise under § 1962(a) rely on the absence of the "employed by or associated with" language of § 1962(c). This § 1962(c) language, the courts reason, requires a relationship of employment or association between the person and the enterprise, and focuses the liability on the person, not the enterprise. The courts further reason that the absence of the restrictive language "employed by or associated with" in § 1962(a) was an indication from Congress that the courts had more flexibility in interpreting § 1962(a). Courts adopting this broader interpretation of § 1962(a) have allowed recovery against a "culpable person" even though that person is also an entity enterprise.[14] In support of their broader interpretation of enterprise under § 1962(a), several courts have pointed to *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 64 L.Ed.2d 246 (1981), where the Supreme Court broadly defined enterprise to include illegitimate as well as legitimate businesses despite legislative history sug-

---

**14.** The entity enterprises that are typically found to be "culpable person" are those that are instruments or perpetrators of the racketeering activity.

gesting Congress' primary concern was infiltration of legitimate businesses.

Courts requiring that the person be distinct from the enterprise under § 1962(a) have justified such an interpretation on various grounds, several of which are summarized in *H.J.*, 648 F.Supp. at 428. More important, from this court's perspective, is the Eighth Circuit's penchant for restrictively interpreting RICO. It is the court's judgment, however, that given two reasonable interpretations of the statute, the Eighth Circuit would adopt the more restrictive construction. It is for this reason that the court will require the existence of a person distinct from the enterprise under both § 1962(a) and (c). This conclusion, however, does not obviate the effect of the court's earlier determination that members of an association in fact can also be persons under both § 1962(a) and (c).

### 4. Enterprise Distinct from Pattern of Racketeering Activity.

Defendants next argue that plaintiffs have failed to show that the alleged enterprise is distinct from the alleged pattern of racketeering activity. Congress enacted RICO to reach "organized crime," not sporadic criminal activity that happened to involve two or more individuals. *United States v. Bledsoe*, 674 F.2d 647, 662 (8th Cir.1982). Perhaps recognizing that attempting to define "organized crime" is conceptually difficult, if not impossible, Congress chose to identify unique characteristics of organized crime and define criminal activity using these characteristics. *Id.* at 662–63. The elements of § 1962, specifically the pattern and enterprise requirements, were designed to distinguish between crimes committed by individuals engaged in organized crime and crimes committed by ordinary criminals. *Id.*

■ To ensure that the statute does not ensnare common criminals associated together solely to perpetrate the acts of racketeering, courts have required the enterprise to be separate and distinct from the pattern of racketeering activity in which it engages. *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–2529, 69 L.Ed.2d 246 (1980). Consequently, the enterprise must exhibit three basic characteristics: 1) common or shared purpose; 2) some continuity of structure and personnel; and 3) ascertainable structure distinct from that inherent in the conduct of the pattern of racketeering activity. *United States v. Lemm*, 680 F.2d 1193, 1198 (8th Cir.1982).

■ Defendants chose not to contend that plaintiffs have failed, as a matter of law, to prove that the alleged enterprise exhibited the first two characteristics. Instead, it is the third characteristic that the defendants take issue with, asserting that the association in fact entity does not have a structure distinct from that inherent in the conduct of the pattern of racketeering activity. In *Bledsoe*, the Eighth Circuit suggested that a distinct structure might be demonstrated by proof that an entity "has an organizational pattern or system of authority beyond what is necessary to perpetrate the predicate crimes," such as "hierarchy, planning, and division of profits" within the entity. *Bledsoe*, 674 F.2d at 665.

While it is clear that the alleged enterprise is not the sophisticated mob organization we read about in the paper or watch on television, there was clearly some thought and planning that went into these rather involved schemes. Indeed, as further evidence of planning, the second scheme was modified slightly to correct the problem of redemption by selling the undeveloped lot at a substantially inflated price. *See supra*, note 6. With regard to the division of profits, it was unclear how Conry and Anderson were dividing profits.

In a subsequently decided case, the Eighth Circuit stated that the enterprise was distinct from the pattern of racketeering activity if the enterprise had a purpose and engaged in acts apart from mail fraud. *Lemm*, 680 F.2d at 1201. Similar to *Lemm*, the defendants here could have carried out each of the schemes without using the United States mails through hand delivery.

The court concludes that there was sufficient evidence to create a fact issue con-

cerning whether the association in fact enterprise had a structure distinct from that inherent in the conduct of the pattern of racketeering activity.

### 5. Damages.

Defendants' final argument in support of JNOV concerns the issues of damages. Defendants base their damage argument on their contention that the plaintiffs failed to establish the necessary predicate acts of mail fraud. In light of the court's resolution of the underlying argument in favor of the plaintiffs, it is unnecessary to discuss the defendants' damage argument.

### B. *New trial.*

Defendants argue in the alternative that they are entitled to a new trial because the jury verdict was contrary to the clear weight of the evidence, based upon groundless and false evidence, and resulted in a miscarriage of justice. The court's power to grant a new trial is broad. A new trial should be granted if "substantial justice has not been done." C. Wright & A. Miller, *Federal Practice & Procedure*, § 2803 at 32 (1973). Substantial justice has not been accomplished when the jury verdict is contrary to the "clear weight, overwhelming weight or great weight of the evidence" *Goldsmith v. Diamond Shamrock Corp.*, 767 F.2d 411, 416 (8th Cir.1985) or when the court's improper evidentiary ruling was prejudicial to the moving party. *Midcontinent Broadcasting Co. v. North Central Airlines, Inc.*, 471 F.2d 357, 359–60 (8th Cir.1973).

In support of their assertion that the verdict was contrary to the clear weight of the evidence, defendants offer a "laundry list" of objections that can be accurately characterized as a shotgun approach.[15] After careful review of each of the objections

raised by defendants, the court is satisfied that none of the fact issues raised by defendants' objections are contrary to the clear weight of the evidence. Indeed, stripped of the numerous complex legal issues, which were resolved by the court in the previous section, this case turned on conflicting testimonial and documentary evidence. The choice between the two versions of the conduct of Conry and Anderson was "essentially a credibility determination for a jury rather than a weight of the evidence issue." *Goldsmith*, 767 F.2d at 416.

Next, defendants challenge the admissibility of several exhibits and the testimony of witnesses, that defendants contend were not properly disclosed prior to trial.[16] Unfortunately, this issue demanded the court's time and attention throughout the trial. Essentially, defendants argued then and argue now that plaintiffs failed to timely disclose certain documents and witnesses. With regard to the witnesses, plaintiffs argue that the witnesses complained of fall into two categories. The first group of witnesses are those that although the particular witnesses were not identified, their employers were and the defendants were told that a representative of those companies would testify. With regard to the remaining witnesses, plaintiffs argue that they were disclosed as soon as they were discovered or retained. With regard to the documents, plaintiffs argue that these documents were not discovered until just prior to trial and were disclosed as soon as they were discovered.

As the court indicated at the various sidebar conferences, plaintiffs' counsel's conduct with regard to the above-mentioned disclosures or lack thereof was less

---

15. Defendants' objections are summarized as follows: Defendants argue that there is insufficient evidence to show: 1) the existence of an association-in-fact enterprise; 2) the enterprise had an effect on interstate commerce; 3) defendants received income from the enterprise used or invested such income in the enterprise; 4) there were any mailings; 5) there were multiple schemes; 6) plaintiffs' damages were caused by alleged wrongful acts; 7) there was a conspiracy between Anderson and Conry.

16. In addition, defendants object to a chart used by plaintiffs' counsel in his closing argument. Since no objection was raised prior to, during, or immediately after its use, defendants have waived their right to object to such conduct. It should be noted that the chart was not available to the jury during deliberation.

than ideal. The court believes, however, that counsel's conduct was attributable to lack of trial experience and time invested in the case, and not to a strategy of trial by ambush. In addition, on at least two different occasions during the trial defendants' counsel expressly stated that he did not feel his clients were sufficiently prejudiced as a result of these evidentiary rulings to justify a mistrial. It seems unfair, following an adverse jury verdict, to entertain his argument to the contrary.

Finally, defendants offer a second laundry list of "errors in the conduct of the proceeding" which necessitates a new trial to prevent a miscarriage of justice.[17] Without addressing each of the alleged errors individually, the court is satisfied that none of the allegations amounted to an error and even if such allegations rose to the level of an error, it could not have prejudiced the defendants' case.

In sum, the court is satisfied that defendants received a fair trial and there was not a miscarriage of justice.

Based upon the record as presently constituted and the foregoing discussion,

IT IS ORDERED THAT:

1. Defendants' motion for judgment notwithstanding the verdict is denied.

2. Defendants' motion for a new trial is denied.

---

17. Defendants' reasons are summarized as follows: 1) the jury failed to give due consideration to the evidence; 2) plaintiffs' counsel's misconduct in improperly disclosing evidence and witnesses; 3) the admission into evidence of numerous hearsay testimony regarding statements allegedly made by Curtis Anderson and documentary evidence containing such hearsay; 4) the misconduct of the court regarding comments about the "quality of lawyering in the case"; 5) the inability of defendants to call Peter Johnson as a witness; 6) the court's charge and special verdict form to the extent it deviates from defendants' requested charge and verdict form; 7) the delay between the close of evidence and submission of the case to the jury.